[Crim. No. 8631. First Dist., Div. Four. June 25, 1971.]

THE PEOPLE, Plaintiff and Appellant, v.
JAMES A. BAIRD et al., Defendants and Respondents.

## COUNSEL

Thomas C. Lynch, Attorney General, Derald E. Granberg and Eric Collins, Deputy Attorneys General, for Plaintiff and Appellant.

Mintz, Giller, Himmelman & Mintz, James Giller, Nason & Goldfarb, Milton Nason, Paul N. Halvonik and Charles C. Marson for Defendants and Respondents.

OPINION

**CHRISTIAN, J.**—The People appeal from an order dismissing an information which charged respondents Baird and Drummond with possession of a fire bomb (Pen. Code, § 452, subd. (b)). Dismissal, under Penal Code section 1385, followed the granting of a motion to suppress evidence pursuant to Penal Code section 1538.5. We reverse the order of dismissal.

During the closing days of June 1968, the portion of Berkeley adjacent to the campus of the University of California was the scene of a serious riot or civil disturbance. Events culminated on June 30, with the imposition of a curfew effective 7 p.m. Fire bombs had been thrown in the affected area during the previous evening; large numbers of police officers were employed in trying to restore order and protect lives and property. Having participated in these unhappy events for three days, Sergeant Glenn and other officers under his direction responded at about 9:30 p.m. to a call to assist a small unit of traffic police who were being attacked by a rock-throwing crowd of about 50 persons. The traffic officers had been posted at a point near the intersection of Telegraph Avenue and Derby Street with directions to block Telegraph Avenue with a line of flares and divert traffic away from the main area of disturbance. As Sergeant Glenn's unit approached, the crowd dispersed.

In the immediate vicinity Sergeant Glenn then saw a man run in a crouched position from a parked car toward Willard Junior High School, on Telegraph Avenue and Stuart Street; a few seconds later, the man ran back to the car. After a few more seconds, Sergeant Glenn again saw a man run from the parked car to the school and back again. He could not see whether anything was being carried by the man (or men). Sergeant Glenn instructed his squad to investigate. As the officers entered the police vehicle, the suspect vehicle made a U-turn across two double lines and proceeded away at somewhat over 40 miles per hour in a 25-mile-per-hour zone. Officer Clifton (who was driving the police vehicle in pursuit) turned on his red light, but the suspect vehicle did not stop. He then used his siren, and the vehicle pulled over and stopped.

Officer Clifton ordered the driver (respondent Baird) out of the car and asked for identification. Sergeant Glenn, Officer Shaffer and Officer Charles approached the passenger side and ordered respondent Drummond out of the vehicle; Sergeant Glenn escorted Drummond to the rear of the vehicle. Officer Shaffer had not been told in detail what Sergeant Glenn had seen; he had been told only that Glenn had observed "some monkey business." Shaffer testified that he looked into the vehicle and saw a large bottle labeled "Apple Juice" on the front seat. There was black

tape on the bottle, which was full of a light pink liquid. Shaffer reached into the car, took the bottle, noticed a small cylinder taped on the side, and placed the bottle on the top of the car. He thought the bottle might contain gasoline, but he "didn't actually know"; he did not think the liquid was apple juice.

Shaffer testified that he also saw, in the back seat, a satchel with bottles protruding from it. These were long and slim Riesling wine bottles with corks "taped in over the top." He entered the vehicle and removed one bottle; as he did so, the bottle slipped from his hand and broke on the ground. Shaffer immediately smelled the odor of gasoline.

Following the discovery of the gasoline, Drummond and Baird were searched. Two carbon dioxide cylinders wrapped in green tape and a small metal circular box containing coiled string-type material were seized from Baird; a metallic cylinder was also taken from Drummond.

Later analysis showed that the bottles were indeed fire bombs, ready armed for use. The metal cylinder taped to the side of each was found to contain black powder with a combustible fuse inserted at the top. A criminalist testified at the preliminary hearing that an experimental explosion of an identical device produced a violently hot fire ball, 25 to 50 feet in diameter, and scattered fragments of glass as far as 70 feet from the explosion.

Baird and Drummond testified, in support of their motion to suppress evidence, that neither the apple juice bottle bomb in the front nor the other two bombs in the back seat were in plain sight. The defense also presented the testimony of an expert witness that it would be difficult, at night, to distinguish apple juice from gasoline.

The trial court in granting the motion to suppress, made the finding that the apple juice bottle was not visible from the outside of the car, and that even if it was, "there still wasn't reasonable and probable cause to go any further, [as] the bottle looked merely like a bottle of apple juice." Although there was no evidence explaining how a large jug could be inserted under the front seat of the suspects' car, as they testified, the Attorney General concedes that we are bound by the court's determination that the bombs were not in plain sight but were discovered as a result of a search.

■ As the search in question was made without a search warrant, the burden was on the prosecution to establish its lawfulness. (*Tompkins* v. *Superior Court* (1963) 59 Cal.2d 65, 67 [27 Cal.Rptr. 889, 378 P.2d 113]; *Badillo* v. *Superior Court* (1956) 46 Cal.2d 269, 272 [294 P.2d 23].) ■ The issue, then, is whether Officer Shaffer, at the time

he removed the bottles, had lawful grounds for searching respondents' automobile. If he did not, the seizure of the bottles thereby discovered was unlawful, and the subsequent searches and seizures were likewise unlawful as "fruit" of the initial illegal activity. (*Wong Sun* v. *United States* (1963) 371 U.S. 471, 485 [9 L.Ed.2d 441, 453, 83 S.Ct. 407]; *People* v. *Superior Court* (1969) 71 Cal.2d 265, 273-274 [78 Cal.Rptr. 210, 455 P.2d 146].)

The officers' right to search the vehicle was not dependent on a right to arrest the occupants. ■ Independent of grounds for arrest, police officers may search a vehicle when they have probable cause to believe that the vehicle contains contraband. (*Chambers* v. *Maroney* (1970) 399 U.S. 42, 48-49 [26 L.Ed.2d 419, 426-427, 90 S.Ct. 1975]; *Carroll* v. *United States* (1925) 267 U.S. 132, 158-159 [69 L.Ed. 543, 553-554, 45 S.Ct. 280, 39 A.L.R. 790]; *People* v. *Terry* (1969) 70 Cal.2d 410, 428 [77 Cal.Rptr. 460, 454 P.2d 36].) The courts have also recognized that the "exigencies of the situation" may justify a warrantless search which might have been unreasonable had emergency circumstances not existed. (*Warden* v. *Hayden* (1967) 387 U.S. 294, 298 [18 L.Ed.2d 782, 787, 87 S.Ct. 1642]; *People* v. *Roberts* (1956) 47 Cal.2d 374, 377 [303 P.2d 721]; *People* v. *Superior Court* (1970) 6 Cal.App.3d 379, 381-382 [85 Cal.Rptr. 803].) "There is no formula for the determination of reasonableness. Each case is to be decided on its own facts and circumstances." (*Go-Bart Co.* v. *United States* (1931) 282 U.S. 344, 357 [75 L.Ed. 374, 382, 51 S.Ct. 153]; *People* v. *Berutko* (1969) 71 Cal.2d 84, 93 [77 Cal.Rptr. 217, 453 P.2d 721].)

■ In the present case, the circumstances known to the police officers when they stopped and searched respondents' car included the following: (1) rioting had been going on in the city for three days; (2) respondents were present at a focus of riot activity; (3) their presence was in violation of a lawful curfew; (4) there had been incidents of fire-bombing earlier the same evening in the vicinity; (5) the suspects fled at high speed upon the approach of the officers; (6) the two furtive running trips between the car and the school suggested a riot-related purpose rather than any innocent purpose. It is true that the officer who saw the suspicious conduct did not make the search and that reasonable cause to search must be based on facts known to the searching officer. (*Dyke* v. *Taylor Implement Co.* (1968) 391 U.S. 216, 221 [20 L.Ed.2d 538, 543, 88 S.Ct. 1472].) But where the officers were working as a team in a fast-moving situation it is not significant that Sergeant Glenn did not interrupt the investigation to brief Shaffer fully before allowing him to particiate further. The shorthand reference to having seen some "monkey business" in the area between the school and the suspect car implied to Shaffer that the

Sergeant had seen riot-related activity which called for precautionary measures including a search for riot weapons.

"Exigent circumstances" have been held to justify warrantless searches involving both premises (see, e.g., *People* v. *Smith* (1966) 63 Cal.2d 779 [48 Cal.Rptr. 382, 409 P.2d 222]; *People* v. *Roberts* (1956) 47 Cal.2d 374 [303 P.2d 721]) and vehicles (see, e.g., *People* v. *Terry* (1969) 70 Cal.2d 410, 424 [77 Cal.Rptr. 460, 454 P.2d 36]; *People* v. *Webb* (1967) 66 Cal.2d 107 [56 Cal.Rptr. 902, 424 P.2d 342, 19 A.L.R.3d 708]). Specifically, circumstances suggesting the existence of an unexploded bomb have been held to constitute "exigent circumstances." (*People* v. *Superior Court, supra,* 6 Cal.App.3d 379.) The combination of circumstances reviewed above justified a reasonable expectation on the part of the officers that they would find riot weapons in the car. The relatively slight intrusion in reaching into the car to bring forth the bombs was reasonable, within the meaning of the Fourth Amendment, in light of the disastrous consequences which might have ensued if respondents had been allowed to drive on and look for an inviting target elsewhere in the city.

The order dismissing the information is reversed.

Devine, P. J., concurred.

**RATTIGAN, J.**—I dissent. While I do not question the relevant Fourth Amendment principles as expressed by the majority, I do not agree that Officer Shaffer's search of the automobile was justified under any of them.

Prior to the pursuit and search of the vehicle, the City of Berkeley had unquestionably experienced civil disturbances in its streets. Although the evidence does not disclose the full nature and extent of these disturbances, it reasonably appears that a curfew had been imposed and that fire bombs had been thrown, at unmentioned times and places within the city, during the preceding three days. In addition, Sergeant Glenn and his squad had witnessed a riotous, rock-throwing incident before pursuing and searching respondents' vehicle. These circumstances in general, however, would not have justified the police in stopping and searching every vehicle in the area; the question thus presented is whether any additional facts distinguished respondents and their vehicle from the myriad of persons and automobiles on the Berkeley streets that night.

The only such facts appeared in the visual observation by Sergeant Glenn—and by him alone—of some persons running to and from a school building. It is apparently true that the driver of respondents' vehicle thereafter committed at least two traffic offenses (crossing a double line and speeding), and did not immediately stop the car when the police officers

turned on their red light. But, absent evidence that respondents knew of the officers' presence and were acting contrarily in response thereto, such actions do not—as the Attorney General and majority suggest—constitute "furtive conduct" from which the officers could reasonably have inferred attempted flight or possession of illegal weapons. (See *People* v. *Superior Court* (1970) 3 Cal.3d 807, 819-822 [91 Cal.Rptr. 729, 478 P.2d 449].) It also bears mentioning that the vehicle search was not justified as incident to a traffic arrest; an arrest for a traffic violation does not, in itself, authorize a search of the vehicle involved. (*People* v. *Superior Court, supra,* at pp. 812-815; *People* v. *Blodgett* (1956) 46 Cal.2d 114, 116 [293 P.2d 57]; *People* v. *Weitzer* (1969) 269 Cal.App.2d 274, 290 [75 Cal.Rptr. 318].) Furthermore, respondents were not arrested for traffic violations and the officers testified that they did not stop the vehicle on account thereof.

I believe, as the trial court found, that Sergeant Glenn's observation of men running from a parked car to a building, and back, was insufficient to justify a search of respondents' vehicle for fire bombs. There are many gestures or movements which a person might make, conceivably consistent with his possession of a fire bomb; but, if respondents were subject to a vehicle search upon the evidence presented here, any person who goes to or behind a building, or who carries a package, or walks on a street at night in an area in which there have been disturbances, would likewise be subject to apprehension and search. I do not accept this conclusion.

The more significant fact, however, is that Officer Shaffer, who made the actual search, was not informed of what Sergeant Glenn had seen at the school. Shaffer candidly testified that he knew only that Sergeant Glenn had mentioned having seen some "monkey business" at the school; with this information and no more, Shaffer decided, on his own and without direction from Sergeant Glenn, to search the vehicle when it stopped. The question of reasonable cause to search must be tested by facts known to the searching officer, regardless of information known to others (including other officers). (*Dyke* v. *Taylor Implement Co.* (1968) 391 U.S. 216, 221-222 [20 L.Ed.2d 538, 543-544, 88 S.Ct. 1472].)

The majority decision validates this search, in part, upon a suspect's having purportedly engaged in "monkey business." (The term imports nothing to me; I doubt, contrary to the majority's interpretation of the term as communicated to Officer Shaffer, that it reasonably imported anything more significant to him.) The thrust of this conclusion, in my opinion, is to sanction an exploratory search "prompted by a general curiosity to ascertain what, if anything, was within the defendant's ve-

hicle." (*People* v. *Cruz* (1968) 264 Cal.App.2d 437, 441 [70 Cal.Rptr. 249].) A search cannot be justified by what it turns up (*People* v. *Brown* (1955) 45 Cal.2d 640, 643-644 [290 P.2d 528]; *People* v. *Fein* (1971) 4 Cal.3d 747, 756 [94 Cal.Rptr. 607, 484 P.2d 583]), and "probable cause cannot be based on a belated interpretation of the suspect's conduct which appears reasonable only in the light of evidence uncovered in that very search." (*People* v. *Superior Court, supra,* 3 Cal.3d 807 at p. 821.) In my view, therefore, the fact that the officers actually found the makings of fire bombs in respondents' automobile cannot retroactively supply the probable cause that was lacking when Officer Shaffer first entered the vehicle.

The majority validates the search as a "relatively slight intrusion in reaching into the car . . . in light of the disastrous consequences which might have ensued if respondents had been allowed to drive on and look for an inviting target elsewhere in the city." The first reference, in my opinion, improperly considers the *degree* of an "intrusion" which was constitutionally invalid in substance; the second reference is a hindsight evaluation which justifies the search upon the basis of what it turned up. As the latter reasoning is impermissible under the Fourth Amendment (*People* v. *Brown, supra,* 45 Cal.2d 640 at pp. 643-644; *People* v. *Fein, supra,* 4 Cal.3d 747 at p. 756), I would not indulge in it upon the present evidence.

For the reasons stated, I would affirm the judgment of dismissal.

A petition for a rehearing was denied July 23, 1971. Rattigan, J., was of the opinion that the petition should be granted. Respondents' petition for a hearing by the Supreme Court was denied August 18, 1971.