22 Cal.App.3d 972 (1972)
99 Cal. Rptr. 647
JOYCE VELMA THOMAS, Petitioner,
v.
THE SUPERIOR COURT OF SAN JOAQUIN COUNTY, Respondent; THE PEOPLE, Real Party in Interest.
Docket No. 13201.
Court of Appeals of California, Third District.
January 18, 1972.
*973 COUNSEL
Robert N. Chargin, Public Defender, Ann M. Chargin, Assistant Public Defender, and Harry T. Carp, Deputy Public Defender, for Petitioner.
No appearance for Respondent.
Evelle J. Younger, Attorney General, Herbert L. Ashby, Chief Assistant Attorney General, Doris H. Maier, Assistant Attorney General, Daniel J. Kremer and A. Wells Petersen, Deputy Attorneys General, for Real Party in Interest.
*974 OPINION
JANES, J.
Petitioner, charged by information with violation of Health and Safety Code section 11530 (possession of marijuana), seeks a writ of mandate to compel respondent court to suppress as evidence a marijuana cigarette which is the basis of that prosecution. (Pen. Code, § 1538.5, subd. (i).)
Respondent court denied petitioner's pretrial motion to suppress after the motion was submitted on the reporter's transcript of the preliminary examination and on evidence received at the hearing of the motion. Viewed in the light most favorable to the People (People v. Harrington (1970) 2 Cal.3d 991, 996-997 [88 Cal. Rptr. 161, 471 P.2d 961]), that record shows the following:
At approximately 10 p.m. on February 12, 1971, Officers Pricola and Jackson of the Stockton Police Department were parked in that city in an unmarked police vehicle about 100 yards from a house occupied by one Clarence Surrell. The officers had "approximately $60,000.00 worth of warrants" for Surrell, and they were trying to apprehend him by watching "traffic" in and out of the house. (The record does not disclose the charge or charges underlying the warrants.)
Looking through field glasses, the officers saw a man fitting Surrell's description come out of the house. There was not enough light to identify him positively. The man paced back and forth in front of the house. Every time a car came by, he would move back into the shadows.
The man had been in front of the house four or five minutes when a station wagon drove up and parked there. (The evidence does not mention the man after this point.) Two persons  apparently a man and a woman  got out of the rear seat of the station wagon. A third person, who appeared to be male, got out of the right front seat. All three went into the house. Then, as Pricola testified, "several people came from the house back to the car. There was a number of trips back and forth between the car and the subject that got out on the right or the passenger side, rear, entered the passenger side, front, and the driver remained in the vehicle at all times while it was there." Pricola testified flatly that no one else entered the car.[1] (Officer Jackson did not testify.)
*975 Five minutes after it arrived, the station wagon pulled away from the house, carrying the driver and the passenger who had entered the right front seat. The station wagon turned at an intersection forty yards from the officers' car, but Pricola was unable to tell whether the two persons in the station wagon were male or female.
The officers followed the station wagon for two blocks and then stopped it. According to Pricola, the only reason the vehicle was stopped was to ascertain the identity of the persons in it.
Pricola walked up to the driver's side of the station wagon. Before the officer reached the door, the driver had stepped from the car. The driver was petitioner. Another female was in the right front seat. As petitioner opened the car door, the dome light went on inside the vehicle. The light stayed on, since petitioner did not close the door. Pricola was standing by the rear door, and he looked into the rear seat. At that time, as the officer later testified, "I observed lying in the back seat in plain view a hand-rolled cigarette in white paper lying right on the seat and my partner [Jackson] was on the other side on the passenger side and ... I believe I told him, `There's an 11530 lying on the seat.'" (Italics added.) The cigarette was about halfway between the front of the seat and the backrest, and approximately 18 inches "from the passenger door."
Pricola next asked petitioner for an operator's license. She replied that she did not have one. The officer then arrested petitioner and her female passenger for possession of marijuana.[2] Petitioner began cursing and screaming at the officers. When a third policeman arrived, she kicked him below the knee, and threatened to kill the officers. She was handcuffed and forcibly placed in a police car.[3]
After petitioner was handcuffed, Pricola entered the station wagon and picked up the cigarette and put it in his pocket. At a time and place not shown by the record, Pricola untucked one end of the cigarette and smelled the vegetable matter which it contained. In his opinion, it had the odor of marijuana. Although he testified that he was "not qualified," he also testified that he had smelled marijuana "previously."
At the preliminary examination, Pricola could not remember what identification petitioner had in her possession when arrested but he believed it *976 may have been a social security card. The vehicle petitioner was driving was later ascertained to be "hers or her sister's...."
The additional evidence received at the section 1538.5 hearing added nothing of substance to the foregoing, except that petitioner introduced some cigarette paper and two hand-rolled tobacco cigarettes which the superior court judge described as not having "the roundness or firmness of a cigarette, even a handrolled tobacco cigarette."

THE HAND-ROLLED CIGARETTE IN PLAIN VIEW DID NOT FURNISH PROBABLE CAUSE FOR THE ARREST AND SEIZURE
(1) The fact that petitioner did not have a driver's license could not serve as a basis for the particular arrest or for Pricola's seizure of the cigarette. (See, People v. Van Sanden (1968) 267 Cal. App.2d 662, 664 [73 Cal. Rptr. 359].)[4] However, the officer's observation of the cigarette, in plain sight within the car, did not constitute a search (People v. Sullivan (1966) 242 Cal. App.2d 767, 770 [51 Cal. Rptr. 778]; People v. Davis (1961) 188 Cal. App.2d 718, 723 [10 Cal. Rptr. 610]); and Pricola could lawfully seize the cigarette without a warrant if he had probable cause to believe it was contraband (see, Coolidge v. New Hampshire (1971) 403 U.S. 443, 458-460 [29 L.Ed.2d 564, 578-579, 91 S.Ct. 2022, 2033-2035]; Chambers v. Maroney (1970) 399 U.S. 42, 48-52 [26 L.Ed.2d 419, 426-428, 90 S.Ct. 1975, 1979-1981]; People v. Terry (1964) 61 Cal.2d 137, 152 [37 Cal. Rptr. 605, 390 P.2d 381]; People v. Baird (1971) 18 Cal. App.3d 450, 454 [95 Cal. Rptr. 700]; People v. Barrett, (1969) 2 Cal. App.3d 142, 146-147 [82 Cal. Rptr. 424]).
(2a) Petitioner asserts that Pricola's view of the cigarette did not constitute probable cause for its seizure and the examination of its contents (nor, inferentially, for the antecedent arrest). The contention must be sustained.
As heretofore noted, the officer testified that on the back seat he saw "a hand-rolled cigarette in white paper" and that he concluded the cigarette was "an 11530"  i.e., a cigarette evidencing violation of section 11530 of the Health and Safety Code. There was no evidence concerning the circumstances or prior visual experience, if any, which caused Pricola to form this on-the-spot opinion. Pricola gave no testimonial comparison between the appearance of hand-rolled tobacco cigarettes and hand-rolled marijuana cigarettes. Indeed, the lack of any evidence concerning the customary appearance *977 of marijuana cigarettes left respondent court with no standard with which it could compare the seized cigarette to determine whether the latter looked distinctively like contraband. For all that the record shows, petitioner was arrested for possession and the car was entered by the police simply because there was a hand-rolled cigarette visible inside it.
It is a matter of common knowledge that hand-rolled tobacco cigarettes have found a new popularity reflecting current individualistic attitudes, changing styles, the availability of new "do-it-yourself" supplies, and increases in the price of factory-mades. Hand-rolled cigarettes "in white paper" are not unusual, and it would be unjust to automatically subject possessors of them to arrest on marijuana charges or their cars to search.
(3) "It is inherently impossible for the contents of a closed opaque container to be in plain view regardless of the size of the container or the material it is made of." (People v. Marshall (1968) 69 Cal.2d 51, 59 [69 Cal. Rptr. 585, 442 P.2d 665].) Where, as here, there is no evidence that the contents of a cigarette were visible, those contents (even if contraband) were not "in plain view." Standing alone, "[t]he plain view of a simply suspicious-looking or unusual object which itself is not contraband, does not justify its seizure without a warrant." (People v. Nickles (1970) 9 Cal. App.3d 986, 992 [88 Cal. Rptr. 763].)
We have not been referred to  nor has our own research disclosed  any appellate case in the United States which holds that the mere presence of a hand-rolled cigarette furnishes probable cause for an arrest, search, or seizure on the theory that the cigarette indicates contraband. Under analogous circumstances, as the following cases show, the courts have invalidated police conduct.
In Remers v. Superior Court (1970) 2 Cal.3d 659 [87 Cal. Rptr. 202, 470 P.2d 11], where the defendant had displayed a tinfoil package, the court said: "The People's reliance on the special knowledge and experience of the arresting officers is ... misplaced.... The People rely on the officers' knowledge that dangerous drugs are often packaged in tinfoil. However, even if dangerous drugs are often packaged in tinfoil, so many other, legitimate items  such as foods or tobacco  are packaged in tinfoil that a tinfoil package is not a suspicious circumstance, and a man of reasonable caution who possesses the knowledge that dangerous drugs are often packaged in tinfoil would not be justified in assuming, upon seeing a tinfoil package, that it is likely to contain drugs." (Id. at p. 666.) (Fn. omitted.) (See also, People v. Brown (1962) 205 Cal. App.2d 188, 193 [22 Cal. Rptr. 835].)
*978 In Abt v. Superior Court (1969) 1 Cal.3d 418, at page 421 [82 Cal. Rptr. 481, 462 P.2d 10], the court ruled that "The probability that a carton of brick-shaped tinfoil-wrapped packages will contain marijuana is not sufficient to justify a search without a warrant." (See also, People v. Baker (1970) 12 Cal. App.3d 826, 842 [96 Cal. Rptr. 756]; but see, People v. Glasgow (1970) 4 Cal. App.3d 416, 422 [84 Cal. Rptr. 671].)
In People v. Goodo (1956) 147 Cal. App.2d 7 [304 P.2d 776], "Officer Blankenship observed appellant was carrying a brown paper sack in his right hand in such manner that it could be disposed of rapidly. The officer testified that marijuana is usually carried in bulk in this kind of a sack but on two occasions, at least, he had observed it carried in a different fashion. The officer arrested appellant and seized the paper sack. It contained marijuana." (Id. at p. 8.) The court said: "Were the observations of the police in this instance sufficient...? The answer to this question lies in the significance to be attached to the fact that appellant was observed emerging from his living accommodations with a brown paper sack in his right hand. It is, of course, a matter of common knowledge that such bags are constantly used by markets, grocery stores, drug stores, and similar commercial enterprises for convenient carrying of merchandise by their customers. Hence, practically every household has a supply of such bags at hand, and the members thereof naturally use them to carry a great variety of items, such, for example, as the children's lunches. This is common practice. And the usual manner of carrying such a bag is in the hand. In fact, there is no other convenient way to carry such a bag in the absence of suitable pockets, and particularly so where the package is too large for available pockets. It is, of course, obvious that marijuana may be carried in a can or other container, and the officer acknowledged that upon occasion this was done. It is therefore apparent that no incriminating significance can reasonably be attached to the fact that appellant was carrying a brown paper sack in his right hand." (Id. at p. 9.)
In People v. Corrado (1968) 22 N.Y.2d 308 [292 N.Y.S.2d 648, 239 N.E.2d 526], the arresting officers saw "four opaque, manila envelopes" being handed to one of the defendants in his car. In reversing the narcotics conviction, the Court of Appeals said: "The People argue, nevertheless, that probable cause existed here because there was uncontradicted testimony by [one of the arresting officers] that, in his experience as an investigator assigned to the Narcotics Bureau, he had never seen loose marijuana in small quantities passed or sold in envelopes other than in the type involved here. This knowledge, it is claimed, justified the officer in drawing the inference that appellants probably had contraband in their possession. [Par.] The argument is defective because the envelopes could have contained *979 any number of noncontraband items.... We conclude, therefore, that the testimony concerning the use of these common envelopes for marijuana does not raise the level of inference from suspicion to probable cause." (22 N.Y.2d at pp. 312-313 [292 N.Y.S.2d at pp. 651-652, 239 N.E.2d at pp. 528-529].) (Fns. omitted.)
And in Taylor v. State (1970) 9 Md. App. 402 [264 A.2d 870], the arresting officer testified that "he looked into the car and `observed laying on the front seat two brown envelopes, and, from my past experience, knowing that these envelopes are used for narcotic drugs, I examined the envelopes.'" In reversing the defendant driver's conviction of unlawful possession of marijuana and methadone, the court said: "The officer's right to seize the brown envelopes within the car ... depended upon whether he had probable cause to believe that the brown envelopes observed within the vehicle contained prohibited narcotic drugs. It is, of course, the function of the court to determine for itself the persuasiveness of the facts relied upon by the police to show probable cause  a function which it manifestly cannot perform unless it is informed of the facts upon which the officer acted. [Citation.] In this connection, the expertise of the officer in narcotics cases may be an important factor in assessing the existence of probable cause. [Citation.] [Par.] As heretofore indicated Officer Puepke testified that from his `past experience,' he knew that the `brown envelopes' which he observed `are used for narcotic drugs.' He did not state the basis for or any facts supporting his mere conclusion, nor was his expertise in the field sought to be established. In short, beyond Officer Puepke's `take it or leave it' conclusion that the brown envelopes were used for narcotics, there was nothing before the trial judge to permit him to intelligently assess whether Puepke's belief had a factual basis amounting to probable cause in the constitutional context. [Par.] (4) Only the probability, and not a prima facie showing of criminal activity is the standard of probable cause. [Citations.] If that constitutional standard is to be satisfied in the case before us, it must be shown, with specificity, rather than by mere conclusion, why the brown envelopes were recognized by Puepke to be of such distinctive nature and character as would permit him to conclude, based on his particularized expertise, that such envelopes probably contained narcotics." (9 Md. App. at pp. 407-408 [264 A.2d at p. 873].)
(2b) Tested by these authorities, petitioner's arrest for possession, and the subsequent seizure, were unlawful.[5] To be distinguished from the facts *980 at bench are search and seizure cases[6] involving cigarettes or smokers' pipes where no issue was raised about inferring probable cause from such items, or where there was evidence of other circumstances such as attempted concealment of the item, the defendant's distinctive manner of smoking it, the odor of burned marijuana, the defendant's evasiveness or abnormal physical condition, an admission by the defendant, or the arresting officer's expertise on the subject.
Petitioner also argues that the initial stop and detention, prior to the arrest and seizure, were unlawful. Although we question the trial court's rejection of that argument,[7] it is unnecessary to determine its merits in view of our holding as to the arrest and seizure.
*981 The order to show cause is discharged. Let a peremptory writ of mandate issue directing respondent superior court to vacate its order denying petitioner's motion to suppress and to enter an order granting said motion. The temporary stay issued herein will terminate upon service of the writ.
Friedman, Acting P.J., and Regan, J., concurred.
The petition of the real party in interest for a hearing by the Supreme Court was denied March 16, 1972.
NOTES
[1] The Attorney General's brief argues that, "[g]iven the distance and darkness factors present at the time," it is reasonable to infer that Pricola "could not tell whether or not any of those persons who were coming and going from the house to the car had not secretly entered the car out of his view." Such contention is simply at odds with Pricola's testimony.
[2] At the conclusion of the preliminary examination, the magistrate declined to hold the passenger to answer; she was discharged from custody.
[3] In addition to the possession count, the information charges petitioner with resisting arrest (Pen. Code, § 148) and driving a motor vehicle without a driver's license in her possession (Veh. Code, § 12951). The petition does not take issue with the latter two charges.
[4] Cf., People v. Nagel (1971) 17 Cal. App.3d 492, 498 [95 Cal. Rptr. 129]; People v. Superior Court (1971) 14 Cal. App.3d 935, 942 [92 Cal. Rptr. 545]; People v. James (1969) 1 Cal. App.3d 645, 648 [81 Cal. Rptr. 845].
[5] The Attorney General does not contend that petitioner's resistance to her arrest furnished probable cause for the seizure. (See, Wong Sun v. United States (1963) 371 U.S. 471, 482-484 [9 L.Ed.2d 441, 452-453, 83 S.Ct. 407, 414-415].)
[6] See, e.g., People v. Terry (1969) 70 Cal.2d 410, 425-428 [77 Cal. Rptr. 460, 454 P.2d 36]; People v. Knight (1971) 20 Cal. App.3d 45, 51 [97 Cal. Rptr. 413]; People v. Gibbs (1971) 16 Cal. App.3d 758 [94 Cal. Rptr. 458]; People v. Nickles, supra, 9 Cal. App.3d at pp. 990-994; People v. Superior Court (1969) 273 Cal. App.2d 459 [78 Cal. Rptr. 153]; Fraher v. Superior Court (1969) 272 Cal. App.2d 155, 160-162 [77 Cal. Rptr. 366], disapproved on other grounds in People v. Fein (1971) 4 Cal.3d 747, 755, fn. 3 [94 Cal. Rptr. 607, 484 P.2d 583]; People v. Brown (1969) 271 Cal. App.2d 391, 395 [76 Cal. Rptr. 568]; People v. Ouellette (1969) 271 Cal. App.2d 33 [76 Cal. Rptr. 346]; People v. Anderson (1968) 266 Cal. App.2d 125, 132-133 [71 Cal. Rptr. 827]; People v. Sullivan, supra, 242 Cal. App.2d 767; People v. Davis (1963) 222 Cal. App.2d 75 [34 Cal. Rptr. 796]; People v. Walker (1962) 203 Cal. App.2d 552, 558 [21 Cal. Rptr. 692]; People v. Davis, supra, 188 Cal. App.2d at p. 720.
[7] Whether an officer is acting upon rational suspicion or upon speculation and hunch is the issue usually presented, first to the magistrate and then to the superior court judge in the event of a suppression motion, and lastly under the substantial evidence rule, to an appellate court. (See, Terry v. Ohio (1968) 392 U.S. 1 [20 L.Ed.2d 889, 88 S.Ct. 1868]; People v. Mickelson (1963) 59 Cal.2d 448 [30 Cal. Rptr. 18, 380 P.2d 658]; People v. Henze (1967) 253 Cal. App.2d 986 [61 Cal. Rptr. 545].) While circumstances short of probable cause may justify temporary detention of a person by a peace officer for investigation and questioning (People v. Mickelson, supra), such detention based on a "mere hunch" is unlawful (People v. Nailor (1966) 240 Cal. App.2d 489, 492-493 [49 Cal. Rptr. 616]). Since resolution of the lawfulness of a given detention must necessarily be made on a case by case basis, it is all-important, particularly to the prosecution, that a record be made which provides indirectly if not directly a basis for establishing the reasonableness of the officer's questioned action. It is in that respect that we question whether the evidence gives satisfactory support to the trial court's conclusion that the initial stop was justified and the temporary detention valid. Recognizing, under the circumstances, that the prosecutor had to take the evidence as it had been obtained, it would have been a simple matter, for example, to show the nature of the charges underlying the "approximately $60,000.00 worth of warrants" for the suspect Surrell. Quite apart from the fact that the incident culminated in a narcotics prosecution, the superior court judge (and thus this court, in review) would have been in a better position to evaluate the reasonableness of the officers' actions if he had known, for example, whether those warrants arose from complaints for burglary or receiving stolen property, from traffic in other contraband, or from an accumulation of complaints arising out of serious motor vehicle offenses.