[Crim. No. 9367. First Dist., Div. One. Nov. 14, 1972.]

THE PEOPLE, Plaintiff and Respondent, v.
ROY JAMES BRADFORD, Defendant and Appellant.

[Crim. No. 9673. First Dist., Div. One. Nov. 14, 1972.]

THE PEOPLE, Plaintiff and Respondent, v.
MORRIS ERVIN, Defendant and Appellant.

(Consolidated Cases.)

**COUNSEL**

LeRue J. Grim, under appointment by the Court of Appeal, for Defendants and Appellants.

Evelle J. Younger, Attorney General, Herbert L. Ashby. Chief Assistant Attorney General, William E. James, Assistant Attorney General, and Robert R. Granucci, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**KONGSGAARD, J.**[*]—Following a trial by jury defendants Ervin and Bradford were convicted of violating Penal Code sections 211 (robbery); 245, subdivision (a) (assault with a deadly weapon); 245, subdivision (b) (assault with a deadly weapon on a peace officer); and 12020 (possession of a sawed-off shotgun). A third co-defendant, Brown, was charged with the same offenses but the jury was unable to reach a verdict on any of the charges against Brown and a new trial was ordered for him.

Prior to trial defendants Bradford and Brown moved to suppress evidence under Penal Code section 1538.5. Defendant Ervin did not join in the motion to suppress. After a hearing the motion to suppress evidence was denied. Defendants' primary attack on appeal is aimed at the denial of the motion to suppress, defendant Bradford contending the court should have granted the motion to suppress while defendant Ervin contends he had inadequate representation because his counsel failed to join in the motion to suppress.

### Statement of Facts

On August 1, 1969, shortly after 10 a.m., Edward Avanzino withdrew $29,550 from his bank to be used for the purpose of cashing payroll checks at his liquor store in San Francisco. He proceeded from the bank to the store and was about to enter his store when he was confronted by three gunmen carrying shotguns and a pistol. Avanzino identified the men carrying the shotguns as defendants Bradford and Ervin. The gunmen took the cash, knocked Avanzino to the ground and fired a pistol shot. Upon arising Avanzino observed the three enter a Mustang automobile and take off. He immediately ran to his own vehicle and proceeded to chase them. As Avanzino pursued the Mustang, shotgun blasts were fired at him by the occupants, and pellets hit the windshield of his vehicle.

Meanwhile Police Officers Busalacchi and Adams, who were on patrol duty in the general area of the robbery, received a radio call advising them of a robbery at Avanzino's liquor store. Shortly thereafter these officers observed the Mustang travelling at a high rate of speed, followed by a vehicle which they recognized as belonging to one of the owners of the liquor store. The officers joined in the chase.

Officer Busalacchi observed four people in the Mustang during the chase, one of whom leaned out of the car and fired approximately four shots from a handgun at the pursuing police vehicle. The high-speed chase continued

---

[*]Assigned by the Chairman of the Judicial Council.

for several minutes until the Mustang finally came to a halt in the 1100 block of Palou Avenue. At this point two individuals alighted from the Mustang and one of them, later identified as Ervin, levelled a handgun at Busalacchi and fired two shots. The officer returned the fire and in the ensuing melee Officer Busalacchi was struck by a shotgun blast fired by defendant Bradford. After these shots defendant Bradford was seen running across the street toward a building identified as either 1050 or 1060 Palou. Officer Adams attempted pursuit of Bradford but lost sight of him and returned to his police vehicle where he radioed for assistance and an ambulance for his wounded partner, Busalacchi.

In the meantime the Mustang, with the remaining occupants, took off from the 1100 block of Palou Avenue and once again Edward Avanzino pursued it. Approximately one block away at 1055 Oakdale, Avanzino's vehicle collided with the Mustang broadside. Avanzino saw two men exit from the Mustang. One of them identified as defendant Ervin pointed a shotgun at Avanzino and then disappeared into a building at 1055 Oakdale Avenue with his companion.

An array of police officers responded to the call for assistance; several went to the area of the 1000 block of Palou Avenue while others went to 1055 Oakdale. In the area of the 1000 block of Palou a search by the officers revealed an expended shotgun casing and empty cartridge on the sidewalk, a shotgun lying behind a hedge at 1040 Palou and a portion of a shotgun barrel outside 1030 Palou. A search of the inside of the premises at 1030 C Palou disclosed a sawed-off shotgun, a card bearing the name of defendant Bradford and a coat similar to that worn by a gunman wielding the shotgun with seven live shotgun shells in a pocket.

Other officers arriving at 1055 Oakdale were told by Avanzino that suspects had run into the building at 1055 Oakdale. Officers entered these premises and discovered defendant Ervin in the bathroom and Brown lying under a bed. Shotgun shells were also found by the officers in these premises.

### Questions Presented

1. Did the lower court err in denying defendant Bradford's motion to suppress evidence?

2. Was defendant Ervin denied effective aid of counsel by the failure of his attorney to join or participate in the motion to suppress?

3. Was the evidence sufficient to support the convictions of defendants for assault with a deadly weapon?

## I

Defendant Bradford claims that the search of his apartment at 1030 C Palou was illegal as the police had no specific information that would justify a search of his apartment. He also claims the illegal search produced incriminating evidence which was so prejudicial to his case that the judgment should be reversed. The People contend the search without a warrant was justified under the emergency circumstances that existed.

Prior to the trial defendant Bradford made a motion to suppress the evidence under Penal Code section 1538.5. This motion was denied and defendant Bradford now seeks a review of the validity of the search and seizure pursuant to subdivision (m) of section 1538.5. ■ Such review is made on the basis of the record made at the special hearing of the motion pursuant to section 1538.5 and may be sought notwithstanding there was no objection to the introduction of the seized material at the trial. (*People* v. *Medina* (1972) 26 Cal.App.3d 809, 815 [103 Cal.Rptr. 337]; *People* v. *Hubbard,* 9 Cal.App.3d 827, 832 [88 Cal.Rptr. 411]; *People* v. *Superior Court,* 9 Cal.App.3d 203, 209 [88 Cal.Rptr. 21]; see also *People* v. *O'Brien* (1969) 71 Cal.2d 394, 402 [78 Cal.Rptr. 202, 79 Cal.Rptr. 313, 456 P.2d 969].)

■ In reviewing a determination of a trial court on a Penal Code section 1538.5 motion, the function of the reviewing court is to determine whether there was substantial evidence to support the trial court's findings. (*People* v. *Superior Court, supra,* 9 Cal.App.3d 203, 209; *People* v. *Superior Court* (1970) 3 Cal.App.3d 476, 488 [83 Cal.Rptr. 771]; *People* v. *Superior Court,* 264 Cal.App.2d 165, 166 [70 Cal.Rptr. 362].) "This rule, however, is not applicable in cases involving searches and seizures in which the facts bearing on the legality of the search are ·undisputed and establish as a matter of law that the evidence is or is not admissible." (*People* v. *Superior Court, supra,* 3 Cal.App.3d at p. 488.) In the instant case the essential facts regarding the issue in question are undisputed; accordingly, the question whether the physical evidence found in the search of Apartment C at 1030 Palou was admissible is a question of law.

At the Penal Code section 1538.5 hearing the People introduced as evidence the transcript of the grand jury proceedings in the case which included testimony by Avanzino, Officers Adams, Magnani, Wydler, Dagitz, Inspector Fogarty, and John Williams, a criminologist in the police department. In addition, Magnani, Fogarty, and Wydler testified in person at the hearing by prearrangement with defense counsel so that they could be cross-examined. Since it is upon this evidence that the denial of the 1538.5 motion

must be justified, the specific information elicited at the hearing is summarized below.

Avanzino's testimony was to the effect that he chased the car with four suspects in it, they shot at him during the chase, and several of them disappeared into the building at 1055 Oakdale. He said nothing about the building at 1030 Palou. Busalacchi added the information that the shootout was on Palou Avenue with a handgun and shotgun, but said nothing about the particular building in question. Officer Adams said he was shot at in the vicinity of 1067 Palou and saw one of the suspects pause on the grass behind 1066 Palou and then disappear between 1040 and 1066 Palou. Officers Dagitz and Williams said nothing about the shootout or search at 1030 Palou except that the area was a federal housing project with several apartments per floor. Other testimony was to the effect that there were four apartments per floor or possibly 8-10 units per building. Fogarty's testimony before the grand jury indicated that there were four apartments per floor or possibly 8-10 units per building. Fogarty also testified that he had conducted a search at 1030 Palou and found a shotgun under a mattress, and a card with Roy Bradford's name on it in a desk or desk drawer.

The information elicited during the cross-examination of Magnani, Wydler and Fogarty at the hearing was as follows: Officer Magnani testified he received a radio communication from the officers that there had been a chase and shootout that ended in the 1000 block of Palou. The only specific information he received was that several of the suspects were in the building at 1055 Oakdale.

Officer Wydler testified that he responded to the location where the car was abandoned, and although he went to 1055 Oakdale, he never went to 1030 Palou.

Officer Fogarty stated that he went to the command post at 1030 Palou "where the Captain was informed by whoever was in charge of the command post at that location that the suspects had fled into the building at [1030].)" He later testified in response to a question as to why he had gone into the building that: "We were told that the suspects had gone in there." Fogarty did not indicate who had so informed the person in charge of the command post. He then proceeded to 1030 Palou.

 When the question of the legality of a search and seizure is raised, the defendant makes out a prima facie case when he establishes that private premises were entered or a search made without a search warrant and the burden then rests on the prosecution to prove that the search was reasonable. (*People* v. *Edwards,* 71 Cal.2d 1096, 1099 [80 Cal.Rptr. 633, 458 P.2d

713]; *Badillo* v. *Superior Court,* 46 Cal.2d 269, 272 [294 P.2d 23]; *Hewitt* v. *Superior Court,* 5 Cal.App.3d 923, 926 [85 Cal.Rptr. 493]; *People* v. *Carson,* 4 Cal.App.3d 782, 786 [84 Cal.Rptr. 699].) It is uncontested that the search herein was made without a warrant. The search, therefore, is subject to the following basic constitutional rule: ". . . 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.' The exceptions are 'jealously and carefully drawn,' and there must be 'a showing by those who seek exemption . . . that the exigencies of the situation made that course imperative.' '[T]he burden is on those seeking the exemption to show the need for it.' " (*Coolidge* v. *New Hampshire,* 403 U.S. 443, 454-455 [29 L.Ed.2d 564, 576, 91 S.Ct. 2022].)

Courts have often recognized that the " 'exigencies of the situation' " may justify a warrantless search which might have been unreasonable had emergency circumstances not existed. (*Warden* v. *Hayden* (1967) 387 U.S. 294, 298 [18 L.Ed.2d 782, 787, 87 S.Ct. 1642].) "There are exceptional circumstances in which, on balancing the need for effective law enforcement against the right of privacy, it may be contended that a magistrate's warrant for search may be dispensed with. . . ." (*Johnson* v. *United States* (1948) 333 U.S. 10, 14-15 [92 L.Ed. 436, 440-441, 68 S.Ct. 367]; see also *Dorman* v. *United States,* 435 F.2d 385, 391.) Responding to an emergency can be a compelling reason for searching without a warrant (*McDonald* v. *United States* (1948) 335 U.S. 451, 454-455 [93 L.Ed. 153, 157-158, 69 S.Ct. 191]) and the reasonableness of each case must be decided on its own facts and circumstances. (*Go-Bart Co.* v. *United States,* 282 U.S. 344, 357 [75 L.Ed. 374, 382, 51 S.Ct. 153]; *People* v. *Berutko,* 71 Cal.2d 84, 93 [77 Cal.Rptr. 217, 453 P.2d 721].)

California applies these principles and follows the rule that the exigencies of a situation may justify a warrantless search which might have been unreasonable had emergency circumstances not existed. (*People* v. *Baird* (1971) 18 Cal.App.3d 450, 454 [95 Cal.Rptr. 700]; *People* v. *Roberts* (1956) 47 Cal.2d 374, 377 [303 P.2d 721]; *People* v. *Superior Court* (1970) 6 Cal.App.3d 379, 381-382 [85 Cal.Rptr. 803].)

The question becomes whether there were exigent circumstances which justified the search without a warrant. In the case at bench, the exigent circumstances are amply demonstrated by the facts preceding the search by the police. An armed robbery and assault had occurred, followed by a high-speed pursuit of the suspects by a police vehicle. During the course of this pursuit shots were fired at the police by the fleeing suspects. The chase terminated when the defendants halted their vehicle, alighted, and engaged in a

gun battle with the police officers. As a result of this battle one of the officers was wounded by shotgun fire. The defendants' automobile departed the scene, leaving behind appellant Bradford who was armed with a sawed-off shotgun. Bradford ran across the street and disappeared between buildings adjacent to the scene on Palou Avenue. Inspector Fogarty, the searching officer, arrived at the scene within minutes and was informed by a police captain, who in turn had been informed by the head of the command post, that the suspect fled into 1030 Palou.

Although the evidence did not indicate whether the person in charge of the command post, presumably another policeman, had personally seen the suspects run into the building or whether he had been given this information by another person, it was not unreasonable under the circumstances of this fast moving situation for the searching officers to rely on the information given them regarding 1030 Palou. (*People* v. *Baird, supra,* 18 Cal.App.3d 450, 454.) Moreover, it would have been unreasonable in such a pressing emergency to require the police to obtain a search warrant to pursue an armed and dangerous criminal. The totality of circumstances and every reasonable inference to be drawn therefrom demonstrated a necessity for the police to locate and disarm the suspects as quickly as possible for their own safety as well as the protection of the local citizenry.

Defendant Bradford points out, however, that the building at 1030 Palou was an apartment house and that his unit was one of several apartments in the building. He asserts the police had no specific information linking his particular unit, Apartment C, to any offense or any offender. The trial evidence, although not the 1538.5 hearing evidence, indicated the officers searched each of the six apartments on the ground floor of 1030 Palou after receiving permission of the occupants but found nothing, and then proceeded to the second floor where they searched five of the six apartments also with the occupants' permission. The sixth apartment on the second floor was C and the police made a forced entry into it. They discovered no one present and then began a more detailed search which disclosed a sawed-off shotgun, a card bearing defendant Bradford's name, and a coat with seven shotgun shells in a pocket. Defendant Bradford argues the systematic search of each unit in the complex constituted a general search that could not be justified under the circumstances.

We answer this argument by pointing out once again the pressing emergency that existed. Under circumstances where an armed robber who had demonstrated a great proclivity for shooting people, had taken apparent refuge in an apartment building with 8 to 12 units, it was not unreasonable for the police in hot pursuit to have conducted a search of each unit for

suspects and weapons. "The law recognizes that fresh pursuit of a fleeing suspect who has committed a grave offense and remains dangerous to life and limb may constitute 'exceptional circumstances' sufficient to justify a search without a warrant." (*People* v. *Smith* (1966) 63 Cal.2d 779, 797 [48 Cal. Rptr. 382, 409 P.2d 222]; see also *Terry* v. *Ohio,* 392 U.S. 1 [20 L.Ed.2d 889, 88 S.Ct. 1868], where the court referred to hot pursuit as an instance of exigent circumstances.)[1]

Another significant circumstance that was known to the police and which intensified the dangerous situation was the fact that there were at least three and possibly four gunmen involved in the escapade. In *Warden* v. *Hayden, supra,* 387 U.S. 294, 298-299 [18 L.Ed.2d 782, 787], the court stated, "The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others. Speed here was essential, and only a thorough search of the house for *persons* and weapons could have insured that Hayden *was the only man* present and that the police had control of all weapons which could be used against them or to effect an escape." (Italics added.)

Admittedly the systematic search in question was an invasion of privacy which would be unreasonable and thus violative of the Fourth Amendment in the absence of some exigent circumstances. However, as we have noted the need for fast and effective law enforcement was overwhelming and it was imperative that the officers conduct an immediate and thorough search of the area for persons and weapons involved in the highly volatile situation.

In testing the reasonableness of the search we might ask ourselves how the situation would have appeared if the fleeing gunman armed with a shotgun had shot and possibly killed other officers or citizens while the officers were explaining the matter to a magistrate.

As the court stated in *People* v. *Superior Court,* 6 Cal.App.3d 379, pages 382-383 [85 Cal.Rptr. 803]: "It is a mark of the genius of the Constitution that the Fourth Amendment, while protecting the right of the people to be secure in their persons, houses, papers and effects, does so only against *unreasonable* searches and seizures. The constant test is

---

[1]In *Dorman* v. *United States, supra,* 435 F.2d 385, at pages 392-393, the court listed a number of considerations that can be useful in determining if a warrantless search is reasonable. These include (1) the existence of a grave offense, particularly a crime of violence; (2) the reasonable belief that the suspect is armed; (3) a clear showing of probable cause to believe the suspect committed the crime; (4) strong reason to believe the suspect is in the premises being entered; (5) a likelihood the suspect will escape if not swiftly apprehended; (6) a peaceable entry. We note that the first five of these considerations were present in the case at bench.

whether a search is reasonable. (*Terry* v. *Ohio,* 392 U.S. 1 [20 L.Ed.2d 889, 88 S.Ct. 1868].)" Under this test, the exigent circumstances of this case made the searches and seizures without a warrant reasonable. Thus, the 1538.5 motion was properly denied by the lower court.

## II

Defendant Ervin contends that the failure of his counsel to join in the 1538.5 motion deprived him of a defense, thereby rendering his counsel ineffective. Respondent argues that since the search and seizure were valid, there is no showing that the failure of defendant's counsel to join in the motion to suppress withdrew a crucial defense or reduced the trial to a farce or sham.

The record indicates that Ervin's counsel joined in the original motion to suppress which was subsequently withdrawn and a 995 motion substituted instead. His counsel did not, however, join in the second 1538.5 motion made by Brown's counsel and joined in by Bradford's counsel. The question is whether this failure indicates that Ervin's counsel was ineffective.

Under the applicable standards, representation by counsel is said to be ineffective when his lack of diligence or competence reduces the trial to a "farce or sham." (*People* v. *Ibarra* (1963) 60 Cal.2d 460, 464 [34 Cal. Rptr. 863, 386 P.2d 487]; *People* v. *Pineda* (1967) 253 Cal.App.2d 443, 467 [62 Cal.Rptr. 144].) A trial may be reduced to such a sham when a crucial defense is lost to defendant due to the lack of knowledge of the law or lack of preparation or investigation. (See *Ibarra,* at pp. 465-466.) Appellant has the burden of establishing the allegation of inadequate representation, and this must be done as a matter of demonstrable reality, and not speculation. (*People* v. *Reeves* (1966) 64 Cal.2d 766, 774 [51 Cal.Rptr. 691, 415 P.2d 35].)

We note that the validity of the search and seizure issue was tried as to defendant Brown and the same facts relevant to a determination of that search and seizure are applicable to defendant Ervin. Those facts as determined at the 1538.5 hearing were that Avanzino saw two of the suspects run into 1055 Oakdale and then saw defendant Brown helped into that same building by two bystanders. There was testimony that Avanzino then told the officers that he had chased the robbers and that "they ran into this building." The officers knew that the buildings were multi-level ones with four apartments per floor or possibly 8-10 units per building. The officers looked in the corridors of 1055 Oakdale and saw no one so they began searching all the apartments. They entered an apartment and found

defendant Ervin in the bathroom. A more thorough search was then begun and defendant Brown was discovered hiding under a bed. When Brown was discovered he stated: "Okay, you've got me, please don't shoot." The defendants were then arrested and in the ensuing search shotgun shells were found in plain view. This seizure of objects in plain view in the area where the police had a right to search for their own protection was valid under *Chimel* v. *California* (1969) 395 U.S. 752 [23 L.Ed.2d 685, 89 S.Ct. 2034].

We note here that Ervin's counsel did join in a 1538.5 motion at one point, thereby indicating an awareness of his right to object to the evidence. For some reason not readily apparent from the record he then decided not to join in the motion finally argued. This action seems to demonstrate that counsel was using his professional judgment and was adopting such tactics and strategy as seemed best suited to the interests of his client. (See *People* v. *Rodriguez* (1969) 275 Cal.App.2d 946, 954 [80 Cal.Rptr. 379].) ■ Appellate courts will not review such strategy and tactics with hindsight nor attempt to second-guess counsel except in rare situations. (*Rodriguez, supra,* at p. 954; *People* v. *Brooks* (1966) 64 Cal.2d 130, 139-140 [48 Cal.Rptr. 879, 410 P.2d 383].)

The situation here finds a close parallel to the case of *People* v. *Berumen* (1969) 1 Cal.App.3d 471 [81 Cal.Rptr. 757]. In that case defendant claimed his counsel was ineffective because he had failed to make a timely section 1538.5 motion prior to the commencement of a second trial and thereby foreclosed the issue of the search and seizure on appeal. The appellate court refused to consider this an act of ineffective counsel on the ground that since there had been a full hearing on the issue at the first trial, counsel may have felt a further hearing would be a senseless act. (See pp. 474-475.) ■ Here counsel may have felt for other reasons, notably the caliber of the evidence available to justify the search and seizure, that it was senseless to pursue the 1538.5 motion. Thus, we cannot say that defendant Ervin was denied the effective assistance of counsel under the circumstances of this case.

### III

■ Finally both appellants contend the evidence is insufficient to sustain their convictions under Penal Code section 245, subdivision (a). In support of this contention both defendants argue that the shot which constituted the 245, subdivision (a) violation was fired from *a pistol,* whereas they were identified as being armed with shotguns. Their assertion that they could not reasonably be said to have aided and abetted the third

party involved in the robbery who fired the pistol shot is without merit. Having engaged with that person in a criminal enterprise, armed with dangerous weapons and knowing that the third party involved was so armed, appellants have aided and abetted in that crime and are guilty as principals. (See *People* v. *Durham* (1969) 70 Cal.2d 171, 181 [74 Cal. Rptr. 262, 449 P.2d 198].)

Defendants also contend the evidence indicated the shot was not fired at Avanzino but was fired into the exterior of the building merely as a warning and with the intent to frighten Avanzino. In *People* v. *Marceaux,* 3 Cal. App.3d 613 [83 Cal.Rptr. 798], it was held the actor must intend to commit a battery and an intent to frighten is not enough to justify a conviction of assault with a deadly weapon. We are not persuaded by defendants' reliance on *Marceaux* since the jury may well have inferred from the evidence that the robber firing the pistol intended to shoot Avanzino but missed his mark.

In considering a claim that evidence is insufficient to sustain a conviction we are bound by the rule that the test on appeal is whether there is substantial evidence to support the trier of fact. (*People* v. *Mosher* (1969) 1 Cal.3d 379, 395 [82 Cal.Rptr. 379, 461 P.2d 659]; *People* v. *Hillery* (1965) 62 Cal.2d 692, 702-703 [44 Cal.Rptr. 30, 401 P.2d 382].) We conclude that there was substantial evidence to indicate that defendants possessed the requisite intent to commit a violation of Penal Code section 245, subdivision (a), and that such a violation was committed by them.

The judgments are affirmed.

Molinari, P. J., and Elkington, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied January 24, 1973.