[Civ. No. 11811. Fourth Dist., Div. Two. Mar. 1, 1972.]

MICHAEL FILITTI, Petitioner, v.
THE SUPERIOR COURT OF ORANGE COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

## COUNSEL

Michael P. Gerbosi, Frank L. Williams, Jr., Public Defender, and James G. Merwin, Deputy Public Defender, for Petitioner.

Cecil Hicks, District Attorney, Michael R. Capizzi, Assistant District Attorney, and Oretta D. Sears, Deputy District Attorney, for Respondent and for Real Party in Interest.

## OPINION

**KERRIGAN, J.**—Charged with possession of marijuana with intent to sell (Health & Saf. Code, § 11530.5), and transportation of marijuana (Health & Saf. Code, § 11531), petitioner, Michael Filitti, pleaded not guilty. His motions to dismiss the information (Pen. Code, § 995) and to suppress evidence (Pen. Code, § 1538.5) were denied. He then sought extraordinary relief in this forum and we issued an alternative writ of mandate. The crucial issue on review is whether the contraband resulted from an illegal search and seizure.

On March 11, 1971, at 12:30 p.m., Laguna Beach Police Officer Saporito was conducting "narcotics surveillance" of a two-block area where Woodland Drive and Victory Walk intersect. He stationed himself on a hillside from which he was able to survey residences in the 100-200 blocks of Woodland Drive. He had participated in approximately 100 arrests in

this area during the preceding 6 months. He had utilized this particular hilltop for surveillance purposes on 4-5 occasions, his specific purpose being to look down on the 2-block area "just to see what he could see."

He utilized a private access road approximately 100 yards long in reaching the surveillance point. The road was posted as private, and the officer saw the signs. On the day in question, however, Saporito conversed with Mr. Kahan, who alleged he resided on the hillside property. He told Saporito he could remain there.

Saporito stood in a grove of trees on top of the hill, about 25-35 yards above the house at 1188 Victory Walk. The entire hillside was covered with trees and bushes. At the bottom was a fence, 3-5 feet high, completely enclosing the backyard at 1188 Victory Walk, except for a 4-5 foot section where the fence was down. Shrubbery and trees from 2-20 feet high grew along the fence. The officer indicated that the trees and bushes may have been 10-20 feet high because "from that position all you observe is just the tops of that stuff . . . You can't even see the contour of the ground."

From his towering vantage point, Saporito observed a Karmann Ghia [a foreign sportscar] drive into the area and park next to 1188 Victory Walk. The petitioner Filitti and a male companion, Steven Ollar, exited the car and walked into the yard. His observations at this time were made without the use of binoculars or even the prescription glasses that he normally wears to correct distance vision. Both petitioner and Ollar sat in the backyard, apparently conversing with Connie Fleming and two unidentified males. Ten minutes later, one of the unidentified males walked over near the east fence with Filitti and Ollar, picked up a plastic bag about a foot square, removed contents which Saporito could not then identify, and showed the bag to Filitti and Ollar. At that point, the officer returned to his car and obtained a pair of eight-power binoculars. Using the binoculars, he kept the five occupants of the yard under observation while they remained seated for ten minutes. Then Miss Fleming walked over near the house, kneeled down with her back toward Saporito and "appeared to be digging or moving her hands." She stood up and turned around, holding a shoe box and a paper bag. The shoe box was uncovered and appeared to contain a dark-colored unidentifiable object, and a 7" x 10" package wrapped in butcher paper.[1] Although Saporito could not see the contents of the wrapped package, he testified that marijuana is often wrapped in this manner. Miss Fleming and the four males went into the house where they remained for ten minutes.

---

[1] Saporito could not see what was in the paper bag.

When they came out, petitioner Filitti was carrying a 10-12″ brown paper bag. The bag was open and Saporito saw a blue substance. Petitioner looked from side-to-side as he walked through the gate to the car. He stopped at the driver's door, looked around, opened the door, and reached into the car. He walked to the back of the car and placed the paper bag in the rear-engine compartment. He closed the hood and sat on it. Ollar, who had followed Filitti to the car, seated himself in the passenger's side while Filitti got into the driver's seat and backed out onto Woodland Drive. Officer Saporito followed and radioed for a patrol vehicle to stop them. Saporito testified he did not intend to arrest Filitti and Ollar, nor did he think he had probable cause to do so. He stopped them ". . . to conduct an investigation." Saporito identified himself and rendered a constitutional advisement, although he did not arrest the men at that time. Notwithstanding the occupants' objections, he searched the engine compartment and found marijuana. He then searched the vehicle's interior and found more marijuana, a hash pipe, and a roach clip.

Petitioner first contends that the warrantless search of the car was illegal. The general rule is that a motor vehicle may be searched without a warrant so long as the officer has probable cause to believe that the vehicle contains contraband. (*People* v. *Gale*, 46 Cal.2d 253, 255 [294 P.2d 13].) To constitute probable cause, a state of facts must be known to the officer that would lead a man of ordinary care and prudence to entertain a strong suspicion that a crime has been committed. (*People* v. *Hillery*, 65 Cal.2d 795, 803 [56 Cal.Rptr. 280, 423 P.2d 208].) Saporito's search of petitioner's vehicle was based entirely on his observations of the activities in the backyard at 1188 Victory Walk. There he saw petitioner and four other individuals in possession of a plastic bag, a brown paper bag and an open shoe box. The shoe box contained a dark-colored object and a small package wrapped in butcher paper. Saporito admittedly had no idea what was in either the plastic bag or the paper bag, or what the dark object in the shoe box was. He guessed that the butcher-wrapped package was marijuana, but he could not see the contents. All five persons, including petitioner, went into the house together, taking with them the bags and shoe box. Petitioner emerged 10 minutes later carrying a brown paper bag which appeared similar to the bag Saporito had seen earlier in the yard. Again, Saporito could not tell what was in the bag. He caught a brief glimpse of something blue in the bag, but admitted that the color suggested nothing in particular to him. Consequently, Saporito could only speculate as to what was in the paper bag petitioner carried to his car.

These facts do not support probable cause for a search. The law is clear that there is no probable cause where an officer merely sees an ex-

change of unidentified objects between two or more persons even in a high narcotics area. (*Cunha* v. *Superior Court*, 2 Cal.3d 352 [85 Cal. Rptr. 160, 466 P.2d 704]; *Remers* v. *Superior Court*, 2 Cal.3d 659 [87 Cal.Rptr. 202, 470 P.2d 11].) In *Cunha*, two officers who had made numerous narcotics arrests in the immediate area observed two pedestrians who looked around as if to see if anyone was watching; the suspects then appeared to exchange an object for money; the Supreme Court ruled that the ensuing arrest and search were illegal, stating that: "Transactions conducted by pedestrians are not per se illegal, and participants' apparent concern with privacy does not imply guilt." (*Cunha* v. *Superior Court, supra*, p. 357.) In *Remers*, two officers who also had made numerous arrests in the same area observed a woman offering a tinfoil-wrapped package to a "hippie-type" man; the officers quickly approached the woman and searched her purse; the search was held illegal even though one officer testified he had often seen drugs wrapped in tinfoil in that fashion; the court noted that legitimate food items are often wrapped in tinfoil.

Saporito's observations included nothing significantly different from the factual situations involved in *Cunha* and *Remers*. Even using binoculars, he could not identify the contents of the various bags and packages, nor could he be certain the bag petitioner carried to the car was the same one as was previously seen in the backyard. The prosecution relies heavily on the fact that petitioner placed the paper bag in the rear-engine compartment of his Karmann Ghia. However, Saporito admitted that he had no idea whether the car's normal storage area was full or whether petitioner's car had storage capacity under the rear hood for tools or other items. He said he could not tell if the bag petitioner carried contained rags, tools, or even a battery. He specifically stated, "I didn't know what was in the bag." Saporito further stated he didn't think he had probable cause to arrest petitioner when he stopped the car, although the standards for probable cause to search an automobile and probable cause to arrest are identical. (*Carroll* v. *United States*, 267 U.S. 132, 161-162 [69 L.Ed. 543, 555, 45 S.Ct. 280, 288-289].) Saporito wanted to conduct the search first, to see what the bag really contained, an indication that he had formed no more than a "hunch" as to the bag's contents.

We conclude that Saporito had not observed facts which were so suspicious that a man of ordinary care and prudence would strongly suspect contraband was in the paper bag. Consequently, we need not reach petitioner's contention that Saporito's regular and systematic observations from the hilltop constituted an unconstitutional invasion of privacy. (See *People* v. *Edwards*, 71 Cal.2d 1096 [80 Cal.Rptr. 633, 458 P.2d 713]; *People* v. *Bradley*, 1 Cal.3d 80 [81 Cal.Rptr. 457, 460 P.2d 129]; *People*

v. *Krivda,* 5 Cal.3d 357 [96 Cal.Rptr. 62, 486 P.2d 1262]; and *People* v. *Conley,* 21 Cal.App.3d 894 [98 Cal.Rptr. 869].)

Let the peremptory writ issue; the alternative writ is discharged.

Tamura, J., concurred.

**GARDNER, P. J.**—I dissent.

The majority of this court premise their conclusion that the search and seizure were illegal on the alleged lack of information available to Officer Saporito to reasonably suspect that contraband was in the car. Having made that decision, it became unnecessary for the majority to discuss the question of the alleged unconstitutional invasion of privacy in Saporito's observation into the backyard. However, since I feel that the majority are in error in their holding on the issue of the search of the car, it becomes necessary for me to discuss the threshold issue of the alleged violation of the defendant's right to privacy.

### THE FACTS

The statement of facts of the majority is generally accurate. However, I would make the following additions, corrections and observations:

The majority seize on Officer Saporito's statement that he was looking "just to see what he could see" and from that leave an inference that he was some kind of a busybody engaged in a course of action which could best be classified as unrestrained snooping into the lives of the citizens of Laguna Beach. However, a reading of the record makes it clear that Saporito was engaged in a narcotics surveillance in an area of high narcotics activity—a course of action which I submit was well within his duties and responsibilities as a police officer.

Officer Saporito was a trained and experienced narcotics investigator and, in his opinion, the object he saw the individuals handling in the backyard had the same size, shape, wrapping and appearance of a kilo of marijuana. This conclusion on his part has a ring of accuracy when we discover that the object found in the engine compartment was a package wrapped in blue cellophane which contained not one but two kilos of marijuana. Of course, Saporito said he did not *know* what was in the package from his point of observation but it was his considered and educated opinion, not his speculation or "hunch," that it was a kilo of marijuana.

The trial court found from its examination of the diagrams and pictures from which Saporito testified that it was "pretty obvious that the person

who lives at S-1 (a house on the hill on which Saporito was standing) could look into their backyard about any time he wants."

## RIGHT OF PRIVACY

It is readily apparent that the observation of Officer Saporito into the backyard constituted no unconstitutional invasion of privacy under the cases of *Edwards, Bradley* and *Krivda* cited by the majority.

The test established by these cases is whether the person has exhibited a *reasonable* expectation of privacy, and, if so, whether that expectation has been violated by unreasonable governmental intrusion.

Here, the backyard was visible to anyone standing where Officer Saporito was standing. If Saporito could see into the yard, I presume that Mr. Kahan, the resident of the property on which Saporito was standing, could see onto it also. In addition, the backyard was visible from the home or homes of persons living nearby. Under such circumstances, if the defendants had a subjective expectation of privacy, it was unreasonable. One may not have a reasonable expectation of privacy from observation in areas clearly visible to neighbors.

The concept of reasonable expectation of privacy has been the subject of a great deal of legal and judicial discussion—much of it pure sophistry. When carried to its illogical conclusion, a burglar has a very real expectation of privacy. For that matter, any criminal (except perhaps one engaged in lewdly exposing his private parts to others) has an expectation of privacy or he would not be committing his crime. Obviously, the concept cannot be tortured in such a way as to protect all kinds of anti-social behavior no matter how private the actor might wish his actions to be.

A man locked in his own bathroom with the blinds drawn rather obviously has a reasonable expectation of privacy. That same man standing in his front yard watering his roses has no such expectation. In between these two examples exist countless thousands of situations, each of which presents to the trier of fact a set of circumstances which are to be tested by the basic test—has that person exhibited a *reasonable* expectation of privacy? Each case presents essentially a question of fact. Any effort to generalize is fraught with disaster. An example of such a generalization is to be found in the statement of the court in *Vidaurri* v. *Superior Court*, 13 Cal.App.3d 550 [91 Cal.Rptr. 704], where at page 553, the court said: "Also, a person who surrounds his backyard with a fence, and limits entry with a gate, locked or unlocked, has shown a reasonable expectation of

privacy for that area [citation]." But if a backyard is surrounded on three sides by 14-story apartment houses, each of which looks down into that backyard, the property owner might have a reasonable expectation of privacy from the standpoint of persons traipsing through his yard, but he would have no expectation of privacy from the standpoint of someone observing him in his backyard—whether that backyard is surrounded by a fence or not.

The parties have exhaustively briefed the cases in this field. Any effort on my part to painstakingly go over each of these cases and discuss the particular factual situation of each, pointing out areas of similarity or dissimilarity, would be a classic exercise in judicial futility. The trial court found on substantial evidence that the facts in this case were such that those individuals in the subject backyard did not have a reasonable expectation of privacy from observation as to their activities. I cannot find as a mattter of law to the contrary.

### PROBABLE CAUSE TO SEARCH

Turning to the issue of probable cause to search the car, I accept the statement of law by the majority that a motor vehicle may be searched without a warrant so long as the officer has reasonable cause to believe that the vehicle contains contraband and to constitute probable cause a statement of facts must be known to the officer which would lead a man of ordinary care and prudence to entertain a strong suspicion of guilt. (*People* v. *Hillery,* 65 Cal.2d 795 [56 Cal.Rptr. 280, 423 P.2d 208]; *People* v. *Gale,* 46 Cal.2d 253 [294 P.2d 13].) However, I strongly disagree with the majority in their application of this law to the particular facts of this case.

What did Officer Saporito know and what reasonable inferences could be drawn from the facts available to him?

First, he was on a narcotics surveillance in an area of high narcotics activity. He, himself, had participated in approximately one hundred arrests during the preceding six months in the Woodland Drive area—described as a two-square block of sub-standard residences. As the trial court observed, it was a matter of common knowledge that that area was an area of high narcotics activity. I am aware that the author of *Cunha* (*Cunha* v. *Superior Court,* 2 Cal.3d 352, 357 [85 Cal.Rptr. 160, 466 P.2d 704]) takes a dim view of testimony concerning a "high narcotic" or "high crime" area. I must respectfully disagree. I am fairly familiar with the narcotics picture in Orange County having spent 13 of the 23 years

between 1947 and 1970 as the presiding judge of the criminal division of that court. I literally grew up with the narcotics traffic in that area. I firmly believe there is a strong factual and legal basis for such testimony. Human beings are gregarious animals and those with common interests tend to cluster together. Throughout the years of the growth of the narcotics traffic, certain areas became meeting places for those in the drug culture—a vacant lot with a seemingly perpetual bonfire in Stanton—a vacant lot in the Delhi section of Santa Ana on which there was a dilapidated sign which carried an obscene message to a vice and narcotics investigator with the Santa Ana Police Department—a particular Winchell's Donut Shop in Anaheim—a pool hall in Fullerton—all of these and many other places became known not only to those in the drug culture but to law enforcement officers as areas of high narcotics activity. Activities observed in these areas would have a different connotation than similar activities observed on the floor of the New York Stock Exchange. Laguna Beach has developed two notorious areas of high narcotics activity—a particular corner of the Coast Highway on which is located a taco shop—and Woodland Drive. I agree with the trial court. It would not take Officer Saporito's testimony to persuade any knowledgeable person that the area under discussion is an area of great narcotics activity. This evidence is of the type that " 'reasonably inspires confidence' " and is of " ' "solid value." ' " (*People* v. *Redmond,* 71 Cal.2d 745, 756 [79 Cal.Rptr. 529, 457 P.2d 321].)

With this as a background, Officer Saporito saw some people behaving in a way which indicated to him as a reasonable man and as an experienced narcotics investigator that they were engaged in narcotics traffic.

He saw the defendants drive up and enter the backyard in question. An individual in that yard then went behind a fence and picked up a plastic bag, a foot square, and showed the contents to these defendants. He saw another individual dig in the ground and come up with a package, shaped like a kilo of marijuana. They all went into the house and when they came out one of the defendants was carrying that which the officer could reasonably infer were the two objects he had seen handled by these individuals before they went into the house. The defendants then walked to the car looking around (about 180°), looked around again and put this rather large package (measuring 10 inches by 12 inches) in the engine compartment. At this point, I find myself in agreement with the trial judge when he said, "Knowing what the officer knew, having observed what he observed with his trained background, I feel that a reasonable man would certainly entertain a strong suspicion that the defendants were transporting contraband."

I cannot accept as reasonable the majority's holding that the activities of the defendant were so consistent with innocence as to overrule the trial court's finding that the officer reasonably had a strong suspicion of criminal activity. The majority suggests that the bundle put into the engine compartment could have contained rags, tools or a battery. In the first place, the storage compartment of a Volkswagen (and a Karmann Ghia) is in the other end of the vehicle. There is no place in the engine compartment of a Volkswagen product to store rags, tools or a battery. A battery is kept under the seat in a Karmann Ghia. Insofar as the battery is concerned, it weighs between 35 and 40 pounds as contrasted with the approximately 4 pounds of a kilo of marijuana. The difference in appearance between a man carrying a battery and a man carrying two kilos of marijuana is a difference between a man carrying a fifth of bourbon and a case of bourbon. And, in addition, I would point out that few people keep rags, tools or batteries buried in their backyard.

Of course, the package *could* have contained something else than kilos of marijuana. It could have contained powdered rhinoceros horn, dried cow bezoar, Howard Hughes Autobiography—or Mr. Justice Peters' famous cookies (*Remers* v. *Superior Court,* 2 Cal.3d 659, 666 [87 Cal.Rptr. 202, 470 P.2d 11]). Frankly, between these choices, I would vote for the latter. After all what better place to keep cookies warm than in the engine compartment?

The majority make much of the statement of Saporito that he did not know what was in the package. Of course, he did not *know*. However, it was his considered opinion, based on his not inconsiderable experience and the objective facts available to him, that the package contained marijuana. He was operating on much more than a mere suspicion or a hunch. A state of facts existed which would lead a man of ordinary care and prudence to reasonably entertain a strong suspicion that the bag contained marijuana.

Thus, based upon the uncontradicted evidence in this case and upon reasonable inferences to be drawn therefrom, the trial court found as a matter of *fact* that there was no reasonable expectation of privacy and that the officer as a reasonable man had sufficient facts on which to entertain a strong suspicion that the car contained contraband. In order to overturn these findings, the majority must find as a matter of *law* that those in the backyard did have a reasonable expectation of privacy and that Officer Saporito did not as a reasonable man have sufficient facts on which to entertain a strong suspicion that the car contained contraband. I submit that on this record this cannot be done. Actually, what the majority have

done is retry the case and in so doing have substituted themselves as the triers of fact—a practice which is clearly contrary to all established rules of appellate review.

I would deny the writ.

A petition for a rehearing was denied March 24, 1972, and the petition of respondent and real party in interest for a hearing by the Supreme Court was denied April 26, 1972. McComb, J., and Burke, J., were of the opinion that the petition should be granted.