[Crim. No. 12730. Third Dist. Mar. 9, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
FRED NORMAN HUNTSMAN, Defendant and Appellant.

COUNSEL

Albert C. Taylor, under appointment by the Court of Appeal, and Harrison, Taylor & Bazile for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Robert D. Marshall and Christine M. Diemer, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

SIMS, J.—Defendant Fred Norman Huntsman appeals from a judgment of conviction by jury of possession of cocaine (Health & Saf. Code, § 11350). Defendant was placed on three years' formal probation conditioned upon service of ten months in Sacramento County Jail. On appeal defendant contends, inter alia, that the trial court erroneously denied his motions to set aside the information and to suppress evidence (Pen. Code, §§ 995, 1538.5)

because the only incriminating evidence was obtained as a result of an illegal detention and subsequent search of an automobile trunk conducted without probable cause. For the reasons set forth below we conclude the warrantless search of the automobile trunk was unlawful, so that defendant's Penal Code section 1538.5 motion was erroneously denied, and we reverse.

We hold, among other things, that where the People assert that an officer's probable cause to search is based on his observation of a citizen holding a container commonly used for innocent purposes (in this case an eight-by-eleven-inch plastic bag with a "Zip-Loc" top), the People must present testimony indicating the basis for the officer's suspicion that the container holds contraband or evidence of crime. Therefore, in the absence of such testimony, the observation of such a container by a police officer does not contribute to probable cause required for a search.

PROCEDURAL AND FACTUAL BACKGROUND

On June 14, 1982, before trial, defendant noticed motions to set aside the information (Pen. Code, § 995) and to suppress evidence (Pen. Code, § 1538.5). The section 995 motion was submitted on the preliminary hearing transcript and the section 1538.5 motion was submitted on the transcript plus testimony.[1] The motions were denied on July 12, 1982, by a minute order that contains no findings of fact.

The scope of appellate review of a motion pursuant to section 995 is different from that of a motion pursuant to section 1538.5. (*People* v. *Laiwa* (1983) 34 Cal.3d 711, 718 [195 Cal.Rptr. 503, 669 P.2d 1278]; see also *People* v. *Pompa-Ortiz* (1980) 27 Cal.3d 519, 529 [165 Cal.Rptr. 851, 612 P.2d 941].) Since our review of the section 1538.5 motion disposes of this appeal, we do not review the denial of the section 995 motion.

---

[1] At the hearing on the section 1538.5 motion, a defense witness testified about his reenactment of the movement of the officers' vehicle as described in the transcript of the preliminary hearing. The witness testified that, when defendant was first observed, he was farther from the officer than prior testimony had indicated. The witness also testified that the officer's view would have been obstructed by shrubs, a sign, and a tree trunk, and that the lighting in the area was "very dim." Following the witness' testimony, the trial court recessed the hearing and, together with defendant and both counsel, took a view of the scene. The court made no oral or written findings. Our recitation of facts assumes the officer's view of defendant was unobstructed; all measurements are those most favorable to the People.

The evidence submitted on the section 1538.5 motion (*People* v. *Gibbs* (1971) 16 Cal.App.3d 758, 760 [94 Cal.Rptr. 458]) viewed in the light most favorable to the trial court's implied findings (*People* v. *Orr* (1972) 26 Cal.App.3d 849, 852-853 [103 Cal.Rptr. 266]), is as follows:

On February 19, 1982, at approximately 7:25 p.m., when it was dark, Sacramento Police Department officers Sherrets and Sharrer were on a "vice" assignment, patrolling the area of 17th and L Streets. The officers, in plain clothes and operating an unmarked vehicle, were traveling southbound on 17th Street.

Officer Sherrets had previously made arrests in the area of 17th and L Streets for prostitution and prostitution-related activity and regarded the area as a high-prostitution area. Officer Sherrets also testified he had made two or three under-the-influence-of-narcotics arrests in the area within two days prior to or after defendant's arrest. The officer did not, however, opine that the area was known for a high incidence of sales of narcotics.

As the two officers were driving along, Officer Sherrets observed two men standing 50 to 60 feet away behind a vehicle in a parking lot next to an alley. The man on the left, later identified as defendant, was facing the vehicle's open trunk and was holding a plastic bag approximately eight inches by eleven inches in size. Officer Sherrets was unable to observe the bag's contents, if any. The man on the right, a black male approximately 20 to 25 years of age, was facing defendant and was looking around. The officer did not observe the men exchange any objects or money. However, the officer immediately thought the men were dealing in stolen property or narcotics.

The officers proceeded about one-half block past the suspects, made a U-turn, and came back toward the vehicle. The suspects noted the vehicle's approach and defendant slammed the trunk lid closed. The suspects walked away from the car into the alley.

The officers got out of their vehicle and Sherrets yelled out, "Police, stop." The suspects continued walking, and hurried their pace. Officer Sherrets ran after defendant and detained him. The officer asked defendant for identification, but defendant refused to identify himself and resisted detention.

Officer Sherrets noticed that defendant had a set of keys in his right hand and asked defendant for them. Defendant refused to give Officer Sherrets the keys. The officer took the keys from defendant and, after looking unsuccessfully around the rear of the car for the bag, used one of the keys to

open the trunk, without consent. Officer Sherrets never obtained a warrant for the search.

In the trunk the officer found an eight-by-eleven-inch plastic bag with a "Zip-Loc" top containing smaller baggies enclosing a white powder. Defendant was then placed under arrest for possession of a controlled substance for sale.

## DISCUSSION

Defendant contends that both the investigative stop and detention and the subsequent warrantless search of the auto's trunk were unlawful, and that the only incriminating evidence, i.e., the cocaine bindles, should have been suppressed. (Pen. Code, § 1538.5.) Because we conclude the search was unlawful, we assume, arguendo, the investigative stop and detention were lawful.

An appellate court's review of a motion to suppress evidence seized in a warrantless search is governed by well-settled principles.[2] ■ "It is axiomatic, of course, that warrantless searches are per se unreasonable under the California and federal Constitutions with only a few carefully circumscribed exceptions, and that the People have the burden of proving that any search without a warrant comes within one of those exceptions. [Citations.]" (*People* v. *Laiwa, supra,* 34 Cal.3d at p. 725.) ■ "The trial court's factual findings relating to the challenged search or seizure, 'whether express or implied, must be upheld if they are supported by substantial evidence.' (*People* v. *Lawler* (1973) 9 Cal.3d 156, 160 [107 Cal.Rptr. 13, 507 P.2d 621].) '"The trial court also has the duty to determine whether, on the facts found, the search was unreasonable within the meaning of the Constitution." (*Ibid.*) Because "that issue is a question of law," the appellate court is not bound by the substantial evidence standard in reviewing the trial court's decision thereon. Rather, . . . in such review it is "the ultimate responsibility of the appellate court to measure the facts, as found by the trier, against the constitutional standard of reasonableness." (*Ibid.*) On that issue, in short, the appellate court exercises its independent judgment.' (*People* v. *Leyba* (1981) 29 Cal.3d 591, 597 [174 Cal.Rptr. 867, 629 P.2d 961], fn. omitted, quoting *People* v. *Lawler, supra,* 9 Cal.3d at p. 160.)" (*People* v. *Loewen* (1983) 35 Cal.3d 117, 123 [196 Cal.Rptr. 846, 672 P.2d 436].)

---

[2]Because the crime at issue occurred before June 9, 1982, the provisions of Proposition 8 (Cal. Const., art. I, § 28) are not applicable to this case. (*People* v. *Smith* (1983) 34 Cal.3d 251, 262 [193 Cal.Rptr. 692, 667 P.2d 149].)

Our starting point is *People* v. *Chavers* (1983) 33 Cal.3d 462 [189 Cal.Rptr. 169, 658 P.2d 96]. ■ There, in considering the legality of a warrantless search of a vehicle's glove compartment and of a shaving kit located therein, Justice Richardson outlined the applicable principles of automobile search and seizure law under the Fourth Amendment to the federal Constitution as follows:[3] "In *Wimberly* v. *Superior Court* (1976) 16 Cal.3d 557 [128 Cal.Rptr. 641, 547 P.2d 417], we examined the general principles which had governed a lawful warrantless search of an automobile in this state. Quoting from earlier cases, we declared that ' "officers are empowered under the *Carroll* [*Carroll* v. *United States* (1925) 267 U.S. 132 (69 L.Ed. 543, 45 S.Ct. 280, 39 A.L.R. 790)] doctrine to search an automobile as 'long as it can be demonstrated that (1) exigent circumstances rendered the obtaining of a warrant an impossible or impractical alternative, *and* (2) probable cause existed for the search.' " ' (16 Cal.3d at p. 563, quoting *People* v. *Dumas* (1973) 9 Cal.3d 871, 884 [109 Cal.Rptr. 304, 512 P.2d 1208]; *People* v. *Cook* (1975) 13 Cal.3d 663, 669 [119 Cal.Rptr. 500, 532 P.2d 148].)" (*Chavers, supra,* 33 Cal.3d at p. 467, italics added; see *People* v. *Superior Court* (*Valdez*) (1983) 35 Cal.3d 11, 15-16 [196 Cal.Rptr. 359, 671 P.2d 863].)

The two-pronged test set forth in *Chavers* makes it clear that exigency is not a *substitute* for probable cause; rather both probable cause and exigent circumstances are necessary to justify a warrantless search of an automobile. *Chavers* did nothing to change Justice Richardson's earlier command in *Cleaver* v. *Superior Court* (1979) 24 Cal.3d 297 at page 307 [155 Cal.Rptr. 559, 594 P.2d 984], that "the search of an automobile—whether pursuant to a warrant or not—must be supported by probable cause."

In *United States* v. *Ross* (1982) 456 U.S. 798 [72 L.Ed.2d 572, 102 S.Ct. 2157], the United States Supreme Court also recently reaffirmed that officers are required to demonstrate objectively verifiable probable cause to believe contraband or evidence of crime is located in a vehicle's trunk before a warrantless search passes muster under the Fourth Amendment. In *Ross,* police officers received a tip from a reliable informant that a person was selling narcotics out of the trunk of a car. The informant described the seller, the car, and its location. The officers immediately verified the location of the car, but the seller was not in the vicinity. The officers left the area. About five minutes later, the officers observed the car driving on the street, stopped it, and discovered a bullet on the car's front seat and a pistol

---

[3]At the time Officer Sherrets searched the trunk neither defendant nor the other man was under arrest. The auto search cannot, therefore, be justified as a search incident to a lawful custodial arrest. (Compare *New York* v. *Belton* (1981) 453 U.S. 454, 459-460 [69 L.Ed.2d 768, 774, 101 S.Ct. 2860]; *People* v. *Galosco* (1978) 85 Cal.App.3d 456, 462 [149 Cal.Rptr. 407].)

in the glove compartment. A warrantless search of the trunk at the scene disclosed a closed brown paper bag which, in turn, contained a number of glassine bags with a white powder in them. A subsequent warrantless search of the vehicle's trunk at the police station produced a zippered red leather pouch with cash in it. (Pp. 800-801 [72 L.Ed.2d at pp. 578-579].)

The Supreme Court held the officers were entitled to conduct a search of the vehicle that was as thorough as a magistrate could have authorized in a warrant particularly describing the place to be searched. (P. 800 [72 L.Ed.2d at p. 578].) On the record presented, the court concluded there was probable cause to search the containers found in the trunk. (Pp. 820-821 [72 L.Ed.2d at pp. 590-591].)

The *Ross* court made it clear that probable cause remained an essential precondition for the warrantless trunk search. Discussing *Carroll* v. *United States* (1925) 267 U.S. 132 [69 L.Ed. 543, 45 S.Ct. 280, 39 A.L.R. 790], Justice Stevens wrote for the majority in *Ross* that, "In defining the nature of this 'exception' to the general rule that '[i]n cases where the securing of a warrant is reasonably practicable, it must be used,' *id.*, at p. 156, 69 L.Ed. 543, 45 S.Ct. 280, the court in *Carroll* emphasized the importance of the requirement that officers have probable cause to believe that the vehicle contains contraband. . . . [¶] Moreover, the probable-cause determination must be based on objective facts that could justify the issuance of a warrant by a magistrate and not merely on the subjective good faith of the police officers. . . . [¶] In short, the exception to the warrant requirement established in *Carroll*—the scope of which we consider in this case—applies only to searches of vehicles that are supported by probable cause." (*United States* v. *Ross, supra*, 456 U.S. at pp. 807-809 [72 L.Ed.2d at pp. 583-584], fn. omitted.)

■ In *Wimberly* v. *Superior Court* (1976) 16 Cal.3d 557 at page 564 [128 Cal.Rptr. 641, 547 P.2d 417], our Supreme Court held that "probable cause for a search exists where an officer is aware of facts that would lead a man of ordinary caution or prudence to believe, and conscientiously to entertain, a strong suspicion that the object of the search is in the particular place to be searched." (See *People* v. *Gee* (1982) 130 Cal.App.3d 174, 181 [181 Cal.Rptr. 524]; see also *Carroll* v. *United States, supra*, 267 U.S. at pp. 161-162 [69 L.Ed. at p. 555].) Where, as here, the auto is not an instrumentality of the commission of a crime, and is therefore not evidence, the "object of the search" must, of course, be reasonably believed to be contraband or evidence of crime. (*Wimberly, supra*, 16 Cal.3d at p. 563.)

Officer Sherrets cited seven factors supporting his decision to search the trunk of defendant's vehicle: (1) he observed defendant holding a small

plastic bag in his right hand; (2) the person standing near defendant "seemed to be looking around as if to see if anybody was watching them;" (3) the area was a high-prostitution area; (4) the officer observed defendant slam the trunk lid closed and walk away as the officers' unmarked car approached; (5) defendant and the other person continued to walk away even faster after the officers identified themselves as police and requested them to stop; (6) defendant refused to identify himself when ordered to do so; and (7) when officers finally detained defendant he had keys but not the plastic bag in his hand. The Attorney General suggests that these factors are sufficient to create probable cause for the trunk search, i.e., to give a person of ordinary caution a strong suspicion that a plastic bag containing narcotics or contraband was in the trunk. (See *Wimberly* v. *Superior Court, supra,* 16 Cal.3d at p. 564.) We disagree.

### A

■ We first address Officer Sherrets' observation of defendant holding an eight-by-eleven-inch plastic bag in his hand. It is crucial to recall, at the outset, that Officer Sherrets did not see whether the bag in fact contained anything at all.[4] Nor did the officer at any time prior to the search either observe or smell the odor of any contraband substance in or about defendant's person or his car. (Compare, e.g., *People* v. *Superior Court (Gilbert)* (1981) 116 Cal.App.3d 450, 453-454 [172 Cal.Rptr. 146]; *People* v. *Briggs* (1976) 62 Cal.App.3d 817, 820 [133 Cal.Rptr. 323]; *People* v. *Podesto* (1976) 62 Cal.App.3d 708, 720 [133 Cal.Rptr. 409].) Nor did defendant appear to be under the influence of a narcotic. (Compare *People* v. *Fraijo* (1977) 78 Cal.App.3d 977, 980 [144 Cal.Rptr. 424].) Nor did Officer Sherrets know or recognize defendant from a prior transaction, arrest, or detention. (Compare, e.g., *People* v. *Diaz* (1980) 101 Cal.App.3d 440, 443 [161 Cal.Rptr. 645]; *People* v. *Superior Court (Karpel)* (1976) 63 Cal.App.3d 990, 992 [134 Cal.Rptr. 174].) Nor did the officer observe any sort of exchange between defendant and any other person. (Compare, e.g., *People* v. *Handy* (1971) 16 Cal.App.3d 858, 860 [94 Cal.Rptr. 387]; *People* v. *Collom* (1968) 268 Cal.App.2d 242, 244 [73 Cal.Rptr. 707]; see generally *People* v. *Aldridge* (1984) 35 Cal.3d 473, 480 [198 Cal.Rptr. 538, 674 P.2d 240].)

In short, the officer simply observed defendant holding an eight-by-eleven-inch plastic bag; no more, no less.[5] Of course, such bags are commonly used to store food and a wide variety of other wholly legitimate objects, including auto parts, bait, fish and game.

---

[4] Thus, the search may not be upheld on the ground that contraband was in "plain view." (Compare, e.g., *People* v. *Ingram* (1981) 122 Cal.App.3d 673, 677 [176 Cal.Rptr. 199].)

[5] The bag turned out to be of the "Zip-Loc" top variety.

Our Supreme Court has condemned the inference that a package commonly used for legitimate purposes contains contraband simply because others like it often do. In *Remers* v. *Superior Court* (1970) 2 Cal.3d 659 [87 Cal.Rptr. 202, 470 P.2d 11], officers had observed the defendant displaying a tinfoil-wrapped package to an alleged narcotics buyer. Neither officer was able to see the contents of the package or any impressions on the tinfoil wrapping; however, one officer testified that dangerous drugs were packaged in tinfoil and another officer testified that seconal tablets were usually similarly packaged. (P. 666.) The court concluded that "in itself a tinfoil package is so commonly used for legitimate purposes that it is not a suspicious circumstance" and that "a man of reasonable caution who possesses the knowledge that dangerous drugs are often packaged in tinfoil would not be justified in assuming, upon seeing a tinfoil package, that it is likely to contain drugs." (*Ibid.*; accord, *Robbins* v. *California* (1981) 453 U.S. 420, 429 [69 L.Ed.2d 744, 752, 101 S.Ct. 2841], fn. 2 (plurality opn.); compare *People* v. *Lilienthal* (1978) 22 Cal.3d 891, 898 [150 Cal.Rptr. 910, 587 P.2d 706].)

In the instant case, we need not go so far as *Remers*. Here, Officer Sherrets offered no evidence of any distinguishing features of the plastic bag which may have set it apart from bags not containing contraband. Moreover, the officer's testimony as to his training and experience suggested no special expertise in determining when plastic bags may contain contraband. Nor did Officer Sherrets testify that in his experience eight-by-eleven-inch plastic bags were often used in transactions involving narcotics or stolen property. Indeed, the officer's testimony is silent with respect to whether he had ever before seen narcotics or stolen property packaged in a bag such as the one he observed.

The importance of such foundational testimony, linking a common container with an unlawful purpose, is illustrated by *People* v. *Lilienthal, supra,* 22 Cal.3d 891. There, officers stopped defendant for a traffic violation at three o'clock in the morning. While defendant fumbled through his wallet for his driver's license, a neatly folded squared piece of paper fell to the ground, and defendant immediately stepped on it. Recognizing the paper packet as one commonly containing unlawful drugs, an officer seized it. It contained cocaine. (*Id.,* at p. 898.) The Supreme Court said: "We first consider defendant's challenge to the seizure of the folded paper that fell from his wallet. He argues that Officer Brookbush did not have probable cause to believe that it contained contraband. His argument is unpersuasive, for it completely ignores Officer Brookbush's testimony as to the basis of his suspicion that the paper contained narcotics. Officer Brookbush described the distinctive manner in which the paper was folded and said that his suspicion that it contained narcotics was based on his experience in

making numerous arrests where cocaine or heroin was transported in paper bindles similar to the one dropped by defendant. Reasonable grounds for believing a package contains contraband may be adequately afforded by the package's shape, design, and the manner in which it is carried. [Citation.]" (*Id.*, at pp. 898-899, fn. omitted.)

The lack of testimony as to its illicit purpose distinguishes the ubiquitous plastic bag in the instant case from the bindle in *Lilienthal* and also from the plastic bag's seldom-seen and rarely-respected second cousin, the un-inflated, knotted-at-the-end party balloon described in *Texas* v. *Brown* (1983) 460 U.S. 730 [75 L.Ed.2d 502, 103 S.Ct. 1535]. There, the United States Supreme Court unanimously[6] rejected a Fourth Amendment challenge to a police officer's plain-view seizure of "an opaque, green party balloon, knotted about one half inch from the tip." 460 U.S. at p. 733 [75 L.Ed.2d at p. 508], opn. of Rehnquist, Burger, White, O'Connor, JJ.) The seizing officer, Maples, testified that because of his previous experience in arrests for drug use, he was aware that narcotics frequently were packaged in balloons like the one the defendant, Brown, held in his hand. (*Ibid.*) Justice Powell, in his concurring opinion, emphasized the uniqueness of the container, noting that "We are not advised of any innocent item that is commonly carried in uninflated, tied off balloon [*sic*] such as the one Officer Maples seized." 460 U.S. at p. 746 [75 L.Ed.2d at p. 517].)

Given the lack of foundational testimony as to the illicit purpose of the plastic bag, the question of whether the bag may be characterized as suspicious is controlled by our prior opinion in *Thomas* v. *Superior Court* (1972) 22 Cal.App.3d 972 [99 Cal.Rptr. 647]. In *Thomas* the arresting officer, Pricola, "observed lying in the back seat [of defendant's auto] in plain view *a hand-rolled cigarette in white paper . . .*" and concluded that the cigarette was "an 11530," a marijuana cigarette. (P. 975, original italics; see former Health & Saf. Code, § 11530.) Holding that the officer's search and seizure of the cigarette had lacked probable cause, we noted that, "There was no evidence concerning the circumstances or prior *visual* experience, if any, which caused Pricola to form this on-the-spot opinion. Pricola gave no testimonial comparison between the appearance of hand-rolled tobacco cigarettes and hand-rolled marijuana cigarettes. Indeed, the lack of any evidence concerning the customary appearance of marijuana cigarettes left respondent court with no standard with which it could compare the seized cigarette to determine whether the latter looked distinctively

---

[6]Justice Rehnquist delivered the lead opinion, in which he was joined by Chief Justice Burger and Justices White and O'Connor. Justice White also wrote a concurring opinion. Justice Powell concurred in an opinion in which he was joined by Justice Blackmun, and Justice Stevens concurred in an opinion in which he was joined by Justices Brennan and Marshall. 460 U.S. at pp. 730-732 [75 L.Ed.2d at pp. 503-504].)

like contraband. For all that the record shows, petitioner was arrested for possession and the car was entered by the police simply because there was a hand-rolled cigarette visible inside it.'"[7] (Pp. 976-977; italics in original; see also *People* v. *Norman* (1975) 14 Cal.3d 929, 933, fn. 5 [123 Cal.Rptr. 109, 538 P.2d 237].)

Apparently recognizing the lacuna in foundational testimony in this case, the Attorney General at oral argument asked us to take judicial notice of the asserted fact that eight-by-eleven-inch plastic bags with "Zip-Loc" tops are often used in narcotics transactions. (See Evid. Code, § 452, subd. (g).) We decline the request for a number of reasons.

First, in passing on the propriety of a ruling on a motion to suppress, it is the job of an appellate court to review evidence submitted on the motion in the trial court. (*People* v. *Gibbs, supra,* 16 Cal.App.3d at p. 761.) No request for judicial notice was made there.

Second, the taking of judicial notice at this point would effectively relieve the People of their burden of demonstrating, on the record, facts within the actual knowledge of the officer objectively justifying the reasonableness of the detention and warrantless search. (See *United States* v. *Ross, supra,* 456 U.S. at p. 808 [72 L.Ed.2d at p. 583]; *Wilson* v. *Superior Court* (1983) 34 Cal.3d 777, 785 [195 Cal.Rptr. 671, 670 P.2d 325]; *In re Tony C.* (1978) 21 Cal.3d 888, 893-894 [148 Cal.Rptr. 366, 582 P.2d 957].)

Third, the device of taking judicial notice at the appellate level would deprive defendant of his right to cross-examine the arresting officer and to present his own evidence on the question of the significance of the plastic bag. Even assuming, arguendo, narcotics are often found in plastic bags, that is hardly the end of a rational inquiry; many questions would remain. For example, one unanswered question is the extent of the experience of the arresting officer with bags such as the one at issue, since it is that experience that is crucial to the reasonableness of a search. (See *United States* v. *Ross, supra,* 456 U.S. at p. 808 [72 L.Ed.2d at p. 583]; *People* v. *Lilienthal, supra,* 22 Cal.3d at p. 899.) Other questions remain with

---

[7] In *Thomas* we cautioned that "It is a matter of common knowledge that hand-rolled tobacco cigarettes have found a new popularity reflecting current individualistic attitudes, changing styles, the availability of new 'do-it-yourself' supplies, and increases in the price of factory-mades. Hand-rolled cigarettes 'in white paper' are not unusual, and it would be unjust to automatically subject possessors of them to arrest on marijuana charges or their cars to search." (22 Cal.App.3d at p. 977.) It goes without saying that the popularity of eight-by-eleven inch plastic bags as containers for objects of all sorts has vastly exceeded the popularity of hand-rolled cigarettes. The injustice would be manifestly greater than in *Thomas* if a citizen's visible use of such a bag automatically constituted a suspicious circumstance contributing to probable cause for a search of a home or car.

respect to whether there may be differences in the kinds of plastic bags used in unlawful transactions,[8] or whether there might be highly plausible explanations for possession of such a plastic bag in the particular location where it was observed. And so forth. "'There are few subjects, perhaps, upon which this Court and other courts have been more nearly unanimous than in their expressions of belief that the right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal.'" (*Barber* v. *Page* (1968) 390 U.S. 719, 721 [20 L.Ed.2d 255, 258, 88 S.Ct. 1318] quoting *Pointer* v. *Texas* (1965) 380 U.S. 400, 405 [13 L.Ed.2d 923, 927, 85 S.Ct. 1065]; see also *People* v. *Barrick* (1982) 33 Cal.3d 115, 130 [187 Cal.Rptr. 716, 654 P.2d 1243]; *In re Miguel L.* (1982) 32 Cal.3d 100, 107-108 [185 Cal.Rptr. 120, 649 P.2d 703].) Moreover, we can hardly fault defendant's trial counsel for choosing not to present evidence on the character of the plastic bag, since the People had the burden of producing evidence of articulable grounds of suspicion in order to meet their burden of proving the reasonableness of the warrantless search. (See *People* v. *Laiwa, supra,* 34 Cal.3d at p. 725.)

Finally, history has shown that where appellate courts have tried to rely on their own experience (rather than on trial testimony) to establish the lawful or unlawful nature of a common container, the results have sometimes appeared disconcertingly inconsistent, varying, as one might expect, with the personal experiences of the justices deciding a particular case. This problem emerged, for example, when the United States Supreme Court confronted the search-based-on-nature-of-container issue in 1981 in *Robbins* v. *California, supra,* 453 U.S. 420 [69 L.Ed.2d 744], disapproved in part in *United States* v. *Ross, supra,* 456 U.S. at pages 814-817 [72 L.Ed.2d at pp. 587-589]. In *Robbins,* a search of a station wagon luggage compartment revealed two packages, slightly larger than cigar boxes, wrapped or boxed in green cellophane. (P. 423 [69 L.Ed.2d at p. 748], fn. 1.) A panel of our First District Court of Appeal upheld police officers' warrantless search of the packages, reasoning that "'[a]ny experienced observer could have inferred from the appearance of the packages that they contained bricks of marijuana.' [Citation.]" (P. 427 [69 L.Ed.2d at p. 751].) The United States Supreme Court reversed, a plurality of the court concluding that the containers' appearance was not so distinctive as to reveal its contents. (P. 428 [69 L.Ed.2d at p. 752].) In a footnote the plurality approved the dissenting observation of Justice Rattigan of the First District Court of Appeal, that "'For all that I see, [the package] could contain books, stationery, canned

---

[8]For example, despite the Attorney General's characterization of the bag in this case as a "baggie," it is not. (Compare, e.g., *People* v. *Superior Court (Gilbert), supra,* 116 Cal.App.3d at p. 453.)

goods, or any number of other wholly innocuous items which might be heavy in weight.'" (P. 429 [69 L.Ed.2d at p. 752], fn. 2.)[9]

To sum up, we conclude that whether a common container constitutes a suspicious circumstance, capable of contributing to the totality of circumstances necessary for probable cause, depends on the total factual context in which the container is observed, including the prior experience of the observing officer with containers of the sort at issue. Thus, for example, an officer who simply observes a citizen carrying an ordinary brown paper bag has no reason to be suspicious. (See *Filitti* v. *Superior Court* (1972) 23 Cal.App.3d 930, 933-934 [100 Cal.Rptr. 583].) But an officer who knows from experience that ordinary brown paper bags are commonly used in narcotics transactions, and that the person who is carrying one has recently sold narcotics to an undercover officer, has every right to be reasonably suspicious. (See, e.g., *People* v. *Lilienthal, supra,* 22 Cal.3d at pp. 898-899; *People* v. *Superior Court (Karpel), supra,* 63 Cal.App.3d at pp. 992-993.) Accordingly, we hold that, in order to permit judicial review of the legality of a detention, arrest, or search, an officer's reasons for suspecting that a common container is being used for unlawful purposes must be articulated on the record. Thus, in this case, absent testimony establishing a contrary inference, defendant's holding a plastic bag was no different from defendant's holding a paper bag, cardboard box, or suitcase. It was simply an innocent act and did not contribute to the probable cause required to search the trunk.

We next examine the officer's other observations to determine whether a person of reasonable caution could strongly suspect from the totality thereof that contraband was located in the plastic bag in the trunk of the car. (See, e.g., *People* v. *Garrett* (1972) 29 Cal.App.3d 535, 538-539 [104 Cal.Rptr. 829].) As we shall explain, we find the observations insufficient.

B

■ We turn first to Officer Sherrets' observation, made on his initial pass by the scene, that defendant's companion "seemed to be looking around as if to see if anybody was watching them." We are immediately confronted with our Supreme Court's recent admonition in *People* v. *Loewen, supra,* that "'Even where an individual is out of doors, his "apparent

---

[9]We note parenthetically that the plurality's conclusion is not drawn into question by *United States* v. *Ross, supra,* 456 U.S. 798 [72 L.Ed.2d 572]. *Ross* held that "If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." (P. 825 [72 L.Ed.2d at p. 594].) *Ross* does not, however, allow officers to infer initial probable cause from the outward appearance of a container.

concern with privacy does not imply guilt." [Citations.]'" (*Loewen, supra,* 35 Cal.3d at p. 126, quoting *People* v. *Bower* (1979) 24 Cal.3d 638, 648 [156 Cal.Rptr. 856, 597 P.2d 115].) We recall that defendant and his companion were outside their automobile after dark in a relatively isolated area. A person seen "looking around" in such an area may well have crime on his mind, as the officer evidently reasoned, but mere looking around is as consistent with fear of being a victim as it is with being a perpetrator.

In *Loewen,* the majority noted that our Supreme Court "has been wary of permitting a police officer to justify a detention by characterizing gestures as criminal. 'The difficulty is that from the viewpoint of the *observer,* an innocent gesture can often be mistaken for a guilty movement. He must not only perceive the gesture accurately, he must also interpret it in accordance with the actor's true intent. But if words are not infrequently ambiguous, gestures are even more so. Many are wholly nonspecific, and can be assigned a meaning only in their context. Yet the observer may view that context quite otherwise from the actor: not only is his vantage point different, he may even have approached the scene with a preconceived notion— consciously or subconsciously—of what gestures he expected to see and what he expected them to mean. The potential for misunderstanding in such a situation is obvious.' (*People* v. *Superior Court (Kiefer)* [1970] 3 Cal.3d [807] at p. 818 [91 Cal.Rptr. 729, 478 P.2d 449, 45 A.L.R.3d 559]; accord, *People* v. *McGaughran* (1979) 25 Cal.3d 577, 590 [159 Cal.Rptr. 191, 601 P.2d 207].)" (*People* v. *Loewen, supra,* 35 Cal.3d at pp. 126-127; italics in original.)

In this case the potential for misunderstanding is heightened by the fact that Officer Sherrets' observation of defendant's companion lasted for only a few seconds. Under the circumstances, the fact that defendant's companion spent two to three seconds looking around contributes little to a reasonable belief that criminal activity was afoot, or that evidence of that activity would be found in a plastic bag inside the vehicle's trunk.

C

 We next consider Officer Sherrets' assertion that defendant was apprehended in an area known for a high incidence of prostitution. Two cases recently decided by our Supreme Court have rejected a police officer's reliance on the "high rate of crime" in an area to justify an investigative stop. In *People* v. *Loewen, supra,* 35 Cal.3d 117, the court held that "An 'officer's assertion that the location lay in a "high crime" area does not elevate . . . facts into a reasonable suspicion of criminality. The "high crime area" factor is not an "activity" of an individual. Many citizens of this state are forced to live in areas that have "high crime" rates or they come to these

areas to shop, work, play, transact business, or visit relatives or friends. The spectrum of legitimate human behavior occurs every day in so-called high crime areas. As a result, this court has appraised this factor with caution and has been reluctant to conclude that a location's crime rate transforms otherwise innocent-appearing circumstances into circumstances justifying the seizure of an individual. [Citations.]' *(People* v. *Bower* (1979) 24 Cal.3d 638, 645 [156 Cal.Rptr. 856, 597 P.2d 115]; see also *Brown* v. *Texas, supra,* 443 U.S. at p. 52 [61 L.Ed.2d at pp. 362-363].) Clearly, it was improper to detain appellant based on this factor." (P. 124.)

Even more recently, in *People* v. *Aldridge, supra,* the court noted, "A history of past criminal activity in a locality does not justify suspension of the constitutional rights of everyone, or anyone, who may subsequently be in that locality." (35 Cal.3d at p. 479.)

We note, moreover, that the causal link between prostitution in the area and contraband in the automobile's trunk was never supplied by the officer's testimony. "In short, as is frequently the problem when a 'high crime area' factor is relied upon, [Officer Sherrets] offered no evidence as to 'how the allegedly suspicious activity [possession of narcotics for sale] [was] related to the type of activity upon which that crime rate estimate [was] based. To the extent such foundational matters are lacking, [this court] cannot logically be expected to accord considerable weight to this factor.'" *(People* v. *Loewen, supra,* 35 Cal.3d at pp. 124-125, quoting *People* v. *Bower, supra,* 24 Cal.3d at p. 646, fn. 8.)[10]

On this record, the fact that the area was one known for a high incidence of prostitution did not contribute to the probable cause required for the search of the trunk.

### D

██ We turn next to Officer Sherrets' observation that defendant and his companion "saw our approach and . . . attempted to walk away hurriedly."

There are multiple problems with the officer's reliance on this factor to generate probable cause to search the trunk. Foremost among them is that

---

[10]We reject the seductive but fallacious argument that because narcotics are often associated with prostitution, the trial court could reasonably infer the officer was observing a sale of narcotics. Officer Sherrets was sufficiently familiar with the area to describe it as a "high prostitution" area. If the area was also one involving a high incidence of narcotics sales, Officer Sherrets presumably would have known that fact and simply could have said so. The officer's testimony did not reveal that any prior arrests had been made in the area for sales of narcotics. There is no substantial evidence supporting an inference that the area was one involving frequent sales of narcotics.

"the suggestion that an apparent effort to avoid a police officer may justify a detention has been refuted in numerous decisions of [the California Supreme Court]. [Citation.]" (*People* v. *Aldridge, supra,* 35 Cal.3d at p. 479.) Where an officer makes no observation of conduct objectively suggesting criminal activity, the mere avoidance of police officers by a citizen cannot justify a detention. (*Ibid.*) *A fortiori,* the citizen's avoidance of officers cannot justify a warrantless search. (See *Terry* v. *Ohio* (1968) 392 U.S. 1, 22 [20 L.Ed.2d 889, 906, 88 S.Ct. 1868]; *In re Tony C., supra,* 21 Cal.3d at p. 892.)

We also note that, as a matter of common sense, the factual predicate for an inference of criminal conduct is simply missing in this case. An inference of prior participation in unlawful activity may be drawn, in certain circumstances, where a citizen knows that police officers are approaching and the citizen engages in flight to avoid the officer presumably because the citizen does not want to be arrested. (See, e.g., *People* v. *Garcia* (1981) 121 Cal.App.3d 239 [175 Cal.Rptr. 296]; *Flores* v. *Superior Court* (1971) 17 Cal.App.3d 219 [94 Cal.Rptr. 496]; *People* v. *Collom, supra,* 268 Cal.App.2d 242; see generally *People* v. *Aldridge, supra,* 35 Cal.3d at pp. 479-480.) A crucial ingredient of the inferential chain is that the citizen knows that those who are approaching, are, in fact, police officers, either because they are driving marked cars or are wearing uniforms (see *People* v. *Garcia, supra,* 121 Cal.App.3d at p. 243; *People* v. *Collom, supra,* 268 Cal.App.2d at p. 245) or because "three men in plain clothes, riding in an unmarked car, cruising at a slow speed in an area of high narcotic activity [at 4:30 in the afternoon] are about as inconspicuous as three bull elephants in a backyard swimming pool." (*Flores* v. *Superior Court, supra,* 17 Cal.App.3d at p. 224, fn. omitted.)

Absent a showing the citizen should reasonably know that those who are approaching are law enforcement officers, no reasonable inference of criminal conduct may be drawn by the citizen's avoidance since, as we have noted, the citizen's conduct is equally consistent with wishing to avoid becoming a victim of crime as with having committed one.

Here, the officers were in plain clothes and were driving an unmarked car at night in a relatively isolated area. So far as the record discloses, until Officer Sherrets said, "Police, stop," defendant had no way to know that those in the car were, in fact, law enforcement officers. Unlike *Flores, supra,* the record demonstrates nothing "conspicuous" about the officers' presence in their unmarked car; indeed, so far as the record indicates, the unmarked car served its intended purpose of disguising the law enforcement identities of its occupants.

As we have noted, the trial court made no explicit findings. On this record, there is no substantial evidence to support an inference that defendant or his companion knew the vehicle contained police officers until the officers identified themselves. Under these circumstances, defendant's walking hurriedly away from an approaching vehicle does not constitute a suspicious act as a matter of law. (See *People* v. *Aldridge, supra,* 35 Cal.3d at p. 479.)

### E

We turn to the officer's testimony that defendant "slammed the lid of the vehicle closed" when the officers' vehicle approached. Initially, we recall that the officer observed the plastic bag only on his initial pass by defendant's vehicle and did not see what became of it after he made the U-turn and entered the alley. Officer Sherrets did not, therefore, actually see defendant put anything in the trunk. (Compare, e.g., *People* v. *Doherty* (1967) 67 Cal.2d 9, 12 [59 Cal.Rptr. 857, 429 P.2d 177].)

The bag's absence raised an inference that it was in some other location, probably the trunk, but its mere absence did not suggest anything about its contents akin to an observed attempt at concealment. Officer Sherrets could hardly have reasoned that if the bag were "legitimate," defendant would not have stored it in the trunk but would have kept it in his possession.

We also note our earlier conclusion that, at the time the trunk lid was "slammed," defendant had no reason to know that the approaching vehicle contained police officers. Therefore, the act of "slamming" the trunk lid cannot reasonably be construed as an attempt to conceal contraband from approaching law enforcement officers. (Compare, e.g., *People* v. *Doherty, supra*; *People* v. *Torralva* (1971) 17 Cal.App.3d 686, 691 [94 Cal.Rptr. 900]; *Flores* v. *Superior Court, supra,* 17 Cal.App.3d at p. 221.) Finally, we note that many car trunk lids cantankerously insist on being "slammed" in order to stay shut, even when the most innocent of items are put in them.

Consequently, in these circumstances, the "slamming" of the trunk lid did not make a measurable contribution to the probable cause required to search the trunk.

### F

We next address Officer Sherrets' observation that defendant had the car keys but not the plastic bag in his hand when he was detained. The officer's observation that defendant held the car keys in his hand when apprehended added nothing to his earlier observations that the trunk was open when he

and Officer Sharrer first arrived on the scene and that defendant later "slammed" the trunk lid. The key merely implied what the open trunk had already expressed: that a plastic bag was probably in the trunk.

### G

Finally, we turn to the remaining factors relied on by Officer Sherrets in his justification of the warrantless search: (a) the fact that defendant hurried his pace after the officer commanded him to stop and (b) the fact that defendant refused to identify himself when asked to do so by the officer. We assume without deciding that defendant had a duty to stop when commanded by the officer to do so and that his "refusal to accede to the officers' request to stop was a less than innocent or normal response to the circumstances." (*People* v. *Garcia, supra,* 121 Cal.App.3d at p. 246; but see *People* v. *Aldridge, supra,* 35 Cal.3d at p. 479.) We also assume without deciding that defendant had a duty to identify himself (but see *Kolender* v. *Lawson* (1983) 461 U.S. 352, 358-362 [75 L.Ed.2d 903, 910-912, 103 S.Ct. 1855]) and that an investigative stop in these circumstances was lawful. (See *People* v. *Aldridge, supra,* 35 Cal.3d at pp. 478-479.)

Defendant's avoidance of the officer and his refusal to identify himself permitted the generalized inference that defendant had engaged in conduct he did not want the officer to find out about. But defendant's flight and silence cannot be construed as identifying any specific unlawful activity. His conduct is consistent with being wanted on a warrant for traffic tickets, unpaid child support, burglary, or murder. Therefore, his conduct cannot reasonably be construed as furnishing "specific articulable facts which give reasonable cause to believe that seizable items are, in fact, concealed in the trunk." (*Wimberly* v. *Superior Court, supra,* 16 Cal.3d at p. 568.)

■ We acknowledge that the legality of a warrantless search must be judged by the totality of circumstances known to the officer at the time. (See *Cleaver* v. *Superior Court, supra,* 24 Cal.3d at p. 307; *Guidi* v. *Superior Court* (1973) 10 Cal.3d 1, 17 [109 Cal.Rptr. 684, 513 P.2d 908].) However, we disregard factors relied on by the officer but found unreasonable as a matter of law, since these factors do not become imbued with an aura of reasonableness by viewing them in their totality. (*People* v. *Loewen, supra,* 35 Cal.3d at p. 129.) Once the officer's observation of an ordinary plastic bag is eliminated as a suspicious factor, the remaining factors relied upon by the officer tend to show, at most, a general consciousness of guilt by defendant and, therefore, a desire to avoid police officers. That unfocused consciousness of guilt, however, is insufficient to constitute probable cause to believe that unlawful contraband was present in the trunk of the car.

In this case, "The People have not shown the required objective, specific, and articulable facts necessary to support this [warrantless search]." (*People* v. *Aldridge, supra,* 35 Cal.3d at p. 480.) The warrantless search of the vehicle's trunk was unlawful under the Fourth Amendment to the United States Constitution and under article I, section 13 of the Constitution of the State of California. (*Wimberly* v. *Superior Court, supra,* 16 Cal.3d at p. 563; *People* v. *Norman, supra,* 14 Cal.3d at p. 937; *Remers* v. *Superior Court, supra,* 2 Cal.3d at p. 669; *People* v. *Knisely* (1976) 64 Cal.App.3d 110, 119 [134 Cal.Rptr. 269]; *Filitti* v. *Superior Court, supra,* 23 Cal.App.3d at p. 934.[11]

## DISPOSITION

The judgment is reversed.

Blease, Acting P. J., and Carr, J., concurred.

---

[11]In light of this disposition, we need not consider defendant's other contentions of error.